**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>BLACK BUFFALO 3D CORPORATION<br><br>Debtor.[1] | Chapter 11<br><br>Case No. 25-12270 (TMH) |

**DECLARATION OF GEORGE PERRY**
**IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY MOTIONS**

George Perry, pursuant to 28 U.S.C. § 1746, under penalty of perjury, declares the following to be true to the best of his knowledge, information and belief:

1. I am the Chief Executive Officer ("CEO") of Black Buffalo 3D Corporation ("Black Buffalo" or "Debtor"). I have been the CEO of Black Buffalo since December 23, 2025, prior to which I was the Chief Technology Officer, beginning in June of 2023, and I was the Head of Technology at Black Buffalo from June of 2022. In my capacity as CEO of Black Buffalo, I am familiar with the day-to-day operations, business, financial affairs, books, and records of the Debtor.

2. I hold a Bachelor of Engineering from Stevens Institute of Technology. Since 2009, I have held several engineering-related positions focused upon construction, particularly concrete construction, including designing structural systems for bridge and infrastructure projects, managing the structural concrete division of a regional construction company, and serving as Director of Engineering for a developer of low carbon cement and concrete.

3. On the date hereof (the "Petition Date"), the Debtor filed a voluntary petition for relief (the "Petition") in the United States Bankruptcy Court for the District of Delaware (the

[1] The Debtor in this case, along with the last four digits of the Debtor's federal tax identification number, is: Black Buffalo 3D Corporation (5412). For purposes of this chapter 11 case, the Debtor's service address is: 1071 Hudson Street, Union, NJ 07083.

"Court") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"). The Debtor intends to continue in possession of its assets and the management of its business as debtor in possession during the pendency of this chapter 11 case (the "Chapter 11 Case"). To minimize the adverse effects on its business, substantially contemporaneously herewith, the Debtor filed the Petition with the Court and motions seeking various forms of relief (collectively, the "First Day Motions").

4. I submit this declaration (this "Declaration") to assist the Court and parties in interest in understanding the circumstances that compelled the commencement of the Chapter 11 Case and in support of the Debtor's Petition and the First Day Motions.

5. All facts set forth in the Declaration are based on my experience and personal knowledge, discussions with the Debtor's advisors, and my review of relevant documents and information concerning the Debtor's operations and financial affairs.

6. I am over the age of 18 and authorized to submit this Declaration on behalf of the Debtor. If called as a witness, I could and would testify competently to the matters set forth herein.

7. Black Buffalo's origins trace to the acquisition of HISYS Co., Ltd. ("HISYS"), a Korean entity engaged in manufacturing 3D construction printers, by HN Inc., formerly Hyundai BS&C Co. Ltd. Black Buffalo was formed in 2020 to serve as the international sales and marketing division for the products produced by HISYS. At the time it was formed, Black Buffalo was a wholly-owned subsidiary of Big Sun Holdings Group, Inc. ("Big Sun"), itself a subsidiary of HN, Inc. Big Sun ultimately determined that the 3D construction printing business should be led from North America due, in part, to the likelihood of broader adoption of 3D construction printing products in North America. Accordingly, Black Buffalo purchased 70% of HISYS and became

the primary holder of the 3D printing intellectual property developed by the business. As discussed below, HISYS remains a critical component of Black Buffalo's business.

8. Black Buffalo is the only full-stack integrator of 3D construction printing solutions, meaning that Black Buffalo is engaged in the design, manufacture and sale of 3D construction printers. Black Buffalo 3D's NEXCON™ construction printers provide developers, contractors, governments, and NGOs with technology and materials designed to save time and money over traditional building methods. The NEXCON™ printing system was developed in global partnership with mechanical engineering and construction experts. Capable of printing multiple stories high, it can print buildings, stand-up walls, or modular components faster and more cost effectively than framed lumber, precast, or block methods, at a fraction of the time and with a stronger, more resilient result.

9. Black Buffalo has funded the development of its products and its operations through the sale of common and preferred stock, and through both secured and unsecured loans. Black Buffalo has sustained operating losses since its founding, including operating losses of $3.16 million in 2023 and $3.7 million in 2024. Throughout 2025, Black Buffalo has attempted to reduce costs and also realized revenue from the sale of 3D printing units, but losses continued, totaling approximately $1 million through June of 2025. Black Buffalo invited its existing equity holders to provide additional funding to the company, but none agreed to do so, and Black Buffalo has been unable to obtain additional funding from its existing or new lenders other than funding associated with the filing of this Chapter 11 Case and the contemplated sale of Black Buffalo's assets.

10. Prior to the Petition Date, Black Buffalo's management and Board of Directors (the "Board") analyzed and explored potential transactions and restructuring alternatives to address the

company's financial constraints. This included retaining INFOR Financial Group ("INFOR")[2] to market the company and its assets to strategic and financial investors and buyers. Unfortunately, that process did not yield any interest. Ultimately, Black Buffalo concluded that commencing a going-concern sale process under the Bankruptcy Code was the most viable path to preserve and maximize the value of its assets and its business.

11. Black Buffalo engaged in negotiations with 100074812 Ontario Inc. (f/k/a AJA Holdings 2013 Inc.), its prepetition secured lender ("Prepetition Secured Lender") and Buffalo OC1 Holdings LLC, a provider of prepetition unsecured bridge financing ("Bridge Lender"). As a result of these efforts, prior to commencing the Chapter 11 Cases, the Debtor reached an agreement on a series of transactions to be effectuated in the Chapter 11 Case, including:

a. to fund the Chapter 11 Case and the sale process, Prepetition Lender and Bridge Lender have agreed to provide $2,000,000.00 in debtor-in-possession financing (the "DIP Financing"), including $1,500,000.00 in new money and a cross-collateralization of $500,000 owed to the Bridge Lender, with the DIP Financing provided through Black Buffalo JVCo LLC (the "DIP Lender"), a joint venture between the Prepetition Secured Lender and Bridge Lender; and

b. DIP Lender will serve as a stalking horse bidder to acquire substantially all of the assets of the Debtor, subject to higher or better bids received during a sale process.

These proposed transactions will allow the Debtor to maximize the value of its business and assets and remain a going concern, which will benefit the Debtor, its employees, and all of its stakeholders.

[2] The Debtor is not seeking to retain INFOR in this Chapter 11 Case.

12. To familiarize the Court with the Debtor, its business, the circumstances leading up to the commencement of the Chapter 11 Case, and the relief the Debtor seeks in the First Day Motions, this Declaration is organized as follows:

- **Part I** provides an overview of the Debtor's corporate history, structure and business operations;
- **Part II** describes the Debtor's prepetition capital structure;
- **Part III** describes the events leading to the filing of the Chapter 11 Case;
- **Part IV** describes the transactions the Debtor hopes to implement in the Chapter 11 Case, including a description of the DIP Financing and sale process; and
- **Part V** provides the factual support for the First Day Motions.

## I. Debtor's Corporate History, Structure, and Business Operations

### A. Company Overview

13. Black Buffalo is a Delaware corporation. The Debtor's corporate offices are located in Union, New Jersey, which facility is leased. The Debtor also leases a storage facility located in East Stroudsburg, Pennsylvania.

14. Black Buffalo also owns a 70% interest in non-debtor HISYS. Black Buffalo utilizes HISYS employees to provide design, engineering, and related services, and funds HISYS's operations through intercompany transfers that are recorded as loans to HISYS in Black Buffalo's financial records. Black Buffalo intends to utilize HISYS for additional services, including some elements of fabrication, in the future.

### B. Black Buffalo's Products

15. The company has designed the NEXCON™ 3D printer, which allows for multi-story 3D printing of structures up to three stories high. The NEXCON™ 3D printer utilizes a

motion-centric gantry design that maximizes the printable area of the machine's footprint without sacrificing print quality. The foundation of the NEXCON™ gantry frame is to customize the print area and meet the unique requirements associated with each build. Clients can either purchase additional tracks or simply reposition the base tracks to shift to a new print area. Black Buffalo has had two claims recognized by the United States Patent & Trademark Office and has applications for recognition of additional claims pending.

16. In October of 2022, the NEXCON™ printing system was the first 3D construction printing system to obtain approval under International Code Council (ICC)'s AC509, which establishes the acceptance criteria for 3D-automated construction used to create 3D concrete walls in building construction.

17. Black Buffalo has established proof of concept through the use of the NEXCON™ printing system to build several homes, including two in Virginia, one in Texas, and one in Illinois, along with two sample homes in Florida and Texas. To date, Black Buffalo has sold four printer units, two domestically and two internationally. Black Buffalo is nearing completion of a second-generation printing solution that it intends to take to market.

18. The following images illustrate Black Buffalo's NEXCON™ 3D printers.





19. Black Buffalo also developed, a proprietary structural construction ink formulation, which is an advanced dry mix that is easy to deploy using NEXCON™ printers by simply adding water. Black Buffalo's structural ink formulation has undergone rigorous examination and worldwide review by a wide range of experts in materials science and applied testing. Structures printed with Black Buffalo 3D printers and concrete ink exceed the strength, durability, and safety of conventional mortars, stick-built housing, and poured cement. Black Buffalo earns licensing fees and fees for services related to its construction ink formula and assists its printer-purchase customers with local sourcing and supply chain logistics to formulate its proprietary blend.

## II. Debtor's Pre-Petition Capital Structure

### A. Equity Ownership

20. Black Buffalo issued common stock in three tranches in 2022, 2023, and 2025, with 7,359,327 shares of common stock issued and outstanding, of which 5,000,000 shares are held by Big Sun. Black Buffalo has also issued 483,420 options to purchase shares of its common stock under the company's 2020 Equity Incentive Plan.

21. Additionally, Black Buffalo has issued seven series of preferred stock, identified as follows:

| Series | Shares Outstanding |
|---|---|
| Series A-1 (PSA1) 2022 | 460,429 |
| Series A-1 2024 | 721,672 |
| Series A-2 (PSA2) | 646,738 |
| Series A-3 (PSA3) | 150,801 |
| Series A-4 (PSA4) | 765,139 |
| Series A-6 (PSA6) | 369,545 |
| Series A (PSA) | 536,585 |

**B. Funded Debt**

22. The Debtor and Prepetition Secured Lender have entered into a series of loan transactions (the "Secured Loans"), beginning in July of 2022, governed by various loan agreements include a Convertible Loan Agreement dated August 30, 2023. As of the Petition Date, the Secured Loans outstanding totaled $5,436,010.00 (the "Prepetition Secured Debt"). The Prepetition Secured Debt is secured by a senior security interest in favor of Prepetition Secured Lender in substantially all of the assets of the Debtor, including a security interest in the Debtor's equity interest in HISYS.

23. The Debtor and All Dimension Home Improvement and Restoration, Inc. ("All Dimension") have entered into a series of loan transactions (the "All Dimension Loans") governed by Convertible Loan Agreements dated as of October 17, 2023. As of the Petition Date, the All Dimension Loans outstanding totaled $806,712.40. The All Dimension Loans are secured by a senior security interest in favor of All Dimension in substantially all of the assets of the Debtor.

24. On October 11, 2025, Bridge Lender provided the Debtor with a $500,000 Bridge Loan, and beginning on November 18, 2025, Bridge Lender and Debtor entered into certain Bridge Financing Agreements, pursuant to which Bridge Lender provided the Debtor with up to $500,000 in bridge financing through the Bridge Loan. The proceeds of the Bridge Loan were held in trust and distributed upon the Debtor's request and approval of the Bridge Lender. As of the Petition Date, the Debtor had drawn down $500,000 of the Bridge Loan. The Bridge Loan is unsecured.

25. The Debtor has also received unsecured loans in the principal amount of $2,485,000.00 at various times from several parties, as identified in the following table.

| Lender | Amount of Unsecured Loans |
|---|---|
| Trinion America Inc. | $1,000,000.00 |
| HDAC Technology AG | $500,000.00 |
| Stemmons Enterprises, LLC | $450,000.00 |
| Big Sun Holdings Group, Inc. | $410,000.00 |
| Stelo Construction LLC | $125,000.00 |
| **TOTAL** | **$2,485,000.00** |

**C. Other Unsecured Claims**

26. The Debtor also owes approximately $1.4 million to approximately 75 vendors, suppliers, employees, taxing authorities, and other parties whose claims are general unsecured claims.

## III. Events Leading to Filing of Bankruptcy Petition

**A. Financial Performance and Liquidity**

27. Until 2025, the Debtor generated little revenue and funded the development of its products and its operations through the issuance of equity and the loans discussed above. Consequently, the Debtor sustained substantial operating losses, including losses of $3,166,980 in 2023 and $3,702,828 in 2024. Despite generating $1,866,302 in revenue through June of 2025 and reducing operating expenses, the Debtor still realized an operating loss of nearly $1,000,000 in the first six months of 2025.

28. The Debtor's existing equity holders and lenders, including All Dimension, have been invited to make additional investments in the Debtor and have declined to do so. The Debtor's Prepetition Secured Lender and Bridge Lender have refused to provide additional financing outside of a restructuring. The Debtor's effort to market and sell itself through INFOR proved unsuccessful. The Debtor has exhausted all of its cash and its only source of funds to

continue operating are the proceeds of the Bridge Loan, which were nearly exhausted as of the Petition Date, placing the Debtor's ongoing operations at risk, including retention of its employees. Accordingly, the Debtor pivoted to negotiating the sale of its assets through a restructuring transaction with the Prepetition Secured Lender and Bridge Lender.

### B. Restructuring Negotiations

29. The Debtor began negotiating the terms of a restructuring transaction with the Prepetition Secured Lender and Bridge Lender in October of 2025. Those negotiations yielded a term sheet for the provision of the DIP Financing, executed December 23, 2025 (the "DIP Term Sheet"). The DIP Term Sheet also contemplates that the DIP Lender will serve as a stalking horse bidder to acquire the Debtor's assets through a sale process to be conducted according to bidding procedures approved by the Court.

## IV. The Proposed Chapter 11 Transactions

### A. The Proposed DIP Facility and Sale Timeline

30. To provide the Debtor with liquidity to operate during the Chapter 11 Case and fund a value-maximizing sale process, the DIP Lender agreed to provide the DIP Facility. The DIP Facility will provide the Debtor with $1,500,000.00 in new money provided through a delayed draw term loan to be made in accordance with an approved budget (the "Approved Budget"), of which $500,000.00 will be made available on an interim basis upon entry of an interim order by the Court, with the remainder available on a final basis upon entry of a final order by the Court. The DIP Facility also includes a "roll-up" through cross-collateralization of the Bridge Loan into the DIP Facility, and a roll-up of the Prepetition Secured Lender's prepetition debt. The DIP Facility will be secured by a first priority lien on all of the Debtor's unencumbered assets that will prime the existing security interests, however the Prepetition Secured Lender has consented to

such priming and All Dimension is being provided with adequate protection to the extent of any diminution of value of its liens. The DIP Lender will also receive a superpriority claim under Section 365(c)(1) of the Bankruptcy Code, subject to a carve out for certain administrative expenses.[3]

31. The DIP Facility contemplates the following timeline for the sale process pursuant to section 363 of the Bankruptcy Code:

- No later than 3 business days from the Petition Date (or such later date as the DIP Lender may agree), the Debtor shall enter into an asset purchase agreement (the "Stalking Horse APA") with the DIP Lender or a designee of the DIP Lender (the "Stalking Horse Bidder").

- No later than 5 business days from the Petition Date (or such later date as the DIP Lender may agree), the Debtor shall file a motion under Section 363 of the Bankruptcy Code ("Sale Procedures Motion"), in form and substance reasonably acceptable to the DIP Lender, requesting an order of the Court (i) approving bidding procedures (the "Bidding Procedures") for the Debtor to sell all or substantially all of its respective assets to a purchaser, including the Stalking Horse Bidder, under an asset purchase agreement, in form and substance reasonably acceptable to the DIP Lender, subject to the receipt of "higher and better" bids (the "Approved Sale"); (ii) approving the Stalking Horse APA; and (iii) establishing a date for a hearing to approve the Approved Sale. The Bidding Procedures shall specifically provide that the Debtor may solicit bids on its assets in bulk or by asset.

- The Debtor will obtain Court approval, pursuant to an order (the "Bidding Procedures Order") in form and substance reasonably acceptable to the DIP Lender, of the Bidding Procedures no later than 28 days after filing the Sale Procedures Motion.

- The Debtor will conduct, subject to Court approval, an auction in accordance with the Bidding Procedures (the "Auction") no later than 45 days after filing the Sale Procedures Motion.

- The Debtor will, subject to availability of the Court, obtain Bankruptcy Court approval, in form and substance reasonably acceptable to the DIP Lender acting in good faith, of the Approved Sale to the successful bidder (the "Approved Sale Order") no later than 3 business days after completion of the Auction.

[3] The DIP Facility is described in greater detail in the *Debtor's Motion for Interim and Final Authority to Obtain Post-Petition Financing and Use Cash Collateral* (the "DIP Motion") filed on the Petition Date.

- The Debtor will consummate the Approved Sale by no later than 60 days after the Petition Date.

32. Time is of the essence in consummating a sale of the Debtor's assets. The Debtor has no cash on hand and no access to cash other than the remaining proceeds from the Bridge Loan, which are insufficient to fund continued operations. The Debtor's employees, who are critical to its ongoing operational success, are on the brink of resigning absent a financially-viable path forward. The DIP Facility provides enough liquidity to complete a value-maximizing sale of the Debtor's assets only within the timeframe established above. The Debtor has no other source of liquidity to allow for a longer sale process.

**B. The Debtor's Need for Immediate Access to the DIP Facility**

33. The DIP Facility will provide the Debtor with the necessary liquidity to fund its business operations and administrative expenses during the Chapter 11 Case, and to run a process to achieve a value-maximizing sale of its assets. The DIP Facility was carefully negotiated and will provide cash necessary to administer the Chapter 11 Case, fund the Debtor's business, pay vendors in the ordinary course, and ensure that taxes and other obligations are paid. The DIP Facility is the best available financing under the circumstances. Access to such financing at this time is essential to effectuate the value-maximizing transactions discussed herein and necessary to avoid immediate and irreparable harm to the Debtor and its estate.

34. The Debtor analyzed its liquidity position, including the necessary pre- and post-petition financing that would be required to operate the Debtor's business and fund the administrative costs of this Chapter 11 Case. As part of this analysis and the overall evaluation of the Debtor's liquidity position, the Debtor prepared a weekly cash flow forecast (the "DIP Budget"), which is to be filed with the Court in connection with the DIP Motion, and which takes

into account anticipated cash receipts and disbursements during the projected period and considers a number of factors, including, but not limited to, the effect of a chapter 11 filing on the operations of the business, the fees and expenses associated with the DIP Facility, restructuring costs (including professional fees and U.S. Trustee fees), required operational payments, and the potential acceleration of demands on available liquidity.

35. Based on the Debtor's 13-week cash flow forecast, the Debtor will experience liquidity shortfalls absent immediate access to the DIP Facility. The DIP Facility is necessary to fund ordinary course operations, pay administrative expenses of the Chapter 11 Case, and preserve the going-concern value of the Debtor's estate pending the sale process.

36. Without access to the DIP Facility, the Debtor will also lose the ability to run the sale process and market its assets, to the detriment of all creditors and other parties in interest and will not otherwise have funds to proceed with the orderly administration of the Chapter 11 Case. Based on this analysis, the Debtor determined that it would need incremental liquidity to comfortably operate its business in the ordinary course post-petition and satisfy all administrative costs and expenses.

37. The Approved Budget reflects that the DIP Facility is sufficient to fund the Debtor's operations and anticipated administrative expenses during the budget period, subject to the permitted variances set forth in the DIP Facility. The liquidity provided by the DIP Facility will also provide the Debtor with the necessary time to consummate a value-maximizing sale transaction and close such a transaction.

38. Immediate access to the funds available under the DIP Facility is crucial to avoid immediate and irreparable harm to the Debtor and its estate. The terms of the DIP Facility were negotiated at arms' length and in good faith and are reasonable as to pricing and fees.

## V. The First Day Motions

39. The Debtor has filed several First Day Motions seeking orders granting various forms of relief intended to facilitate the efficient administration of the Chapter 11 Case and otherwise maximize and preserve the value of the estate. The factual basis for each of the First Day Motions is summarized below.

### A. *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, and Reimbursable Employee Expenses, and (B) Continue Employee Benefit Programs and Other Employee-Related Programs and (II) Granting Related Relief*

40. The Debtor has four hourly employees (each an "Employee") who are essential to the Debtor's continued business operations, performing substantially all of the work undertaken by the Debtor. Loss of the Employees would materially and negatively impact the Debtor's ability to reorganize and maximize the value of its assets.

41. Employees are paid bi-weekly. The total bi-weekly compensation for these employees is approximately $23,000. The Debtor makes contributions to an Employee healthcare plan for one Employee, which total approximately $700 per pay period. The Debtor pays the employer share of withholding taxes each pay period totaling approximately $1,100.00. Employees also accrue sick time, which may be used by Employees with the approval of management.

42. The Debtor pays a third party to administer a 401k plan for its Employees at a monthly cost of $48.00 through December 31, 2025, increasing to $56.00 per month thereafter. The Debtor does not make matching contributions to Employee 401k accounts but does remit amounts withheld from Employee pay to the 401k plan administrator.

43. The Debtor reimburses Employees for certain business-related expenses. As of the Petition Date, the Debtor owed one Employee approximately $2,000 in reimbursable expenses related to the prepetition period ("Reimbursable Expenses").

44. The Debtor seeks authority to pay all prepetition compensation owed to Employees and related withholdings ("Employee Compensation") for the pay period immediately preceding the Petition Date and to maintain and pay all amounts related to employee benefit programs ("Employee Programs").

45. As of the Petition Date, the amount owed on account of unpaid Employee Compensation and Employee Programs Employees was as follows:

| Item | Amount |
|---|---|
| Prepetition Wages | $8,850.00 |
| Prepetition Healthcare Premiums | $700.00 |
| Prepetition Withholding Taxes | $434.00 |
| Prepetition 401k Withholdings | $458.00 |
| Prepetition 401k Administration Cost | $48.00 |
| Reimbursable Expenses | $2,000.00 |
| **TOTAL** | **$12,490.00** |

46. No Employee receives wages and benefits in excess of $17,150 per pay period. The repayment of the Reimbursable Expenses owed to the Employee mentioned above would not increase the amount paid to that Employee on account of prepetition amounts above $17,150.

**B. *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Continue Operating Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto (C) Maintain Existing Business Forms, and (D) Perform Intercompany Transactions and (II) Granting Related Relief***

47. The Debtor maintains two bank accounts, one with Flagstar Bank, N.A. ("Flagstar") ending in -9568 ("Flagstar Account") and one with TD Canada Trust ("TD") ending in -5275 ("TD Account"). Prior to the Petition Date, the Debtor was migrating all of its banking functions to the TD Account, however due to the commencement of this chapter 11 case, the Debtor will maintain all banking functions and substantially all of its cash in the Flagstar Account for the duration of this Chapter 11 Case (the "Cash Management System").

48. The Debtor incurs certain fees and charges in connection with the ordinary course operation of the Cash Management System, including fees imposed under the Debtor's prepetition agreements with the Flagstar (the "Bank Fees"). The Bank Fees include account maintenance charges, charges relating to ACH and wire transfers and depository service charges, and other customary miscellaneous charges. On average, the Debtor incurs approximately $100.00 in Bank Fees per month. In the ordinary course of business, typically on a monthly basis, Flagstar charges the Debtor and deducts from the Flagstar Account certain service charges and other fees, costs and expenses. As of the Petition Date the Debtor was current on all Bank Fees.

49. The Debtor utilizes various preprinted business forms (the "Business Forms") in the ordinary course of its business (e.g. letterhead, purchase orders, invoices, and checks), including in connection with its Cash Management System. To the extent necessary, the Debtor seeks authority to use pre-existing Business Forms without such a reference in order to minimize expense to its estate. The Debtor submits that parties in interest will not be prejudiced if such relief is granted because parties doing business with the Debtor will likely be aware of its status as a debtor-in-possession and, therefore, changing Business Forms is unnecessary and burdensome.

To the extent the Debtor exhausts its existing supply of checks, the Debtor will order checks with the designation "Debtor-in-Possession" and the case number of this chapter 11 case.

50. As discussed above, the Debtor holds a 70% equity interest in HISYS. The Debtor funds HISYS's operations through intercompany transactions ("Intercompany Transactions") and records those transfers as loans receivable on the Debtor's balance sheet. The Debtor transfers approximately $40,000.00 to $46,000.00 to HISYS to fund its operations, including payroll, on a monthly basis. These Intercompany Transactions are essential to preserve the Debtor's operations and the value of the Debtor's investment in HISYS.

**C. *Debtor's Motion for Entry of Interim and Final Orders (I) Determining Adequate Assurance of Payment for Future Utility Services; (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services; (III) Approving Debtor's Proposed Procedures for Resolving Adequate Assurance Requests; and (IV) Granting Related Relief***

51. In connection with the operation of its business, the Debtor obtains electricity, natural gas, telecommunications, water, waste management (including sewer and trash), internet, and other similar services (collectively, the "Utility Services") from several utility providers (each, a "Utility Provider" and collectively, the "Utility Providers").

52. Uninterrupted Utility Services are essential to the Debtor's ongoing business operations and the overall success of this Chapter 11 Case. Any interruption in Utility Services, even for a brief period of time, would seriously disrupt the Debtor's ability to operate its business and would irreparably harm relationships with the Debtor's customers. As such, should any Utility Provider refuse or discontinue service, even for a brief period, the Debtor's business operations would be severely disrupted, causing a decline in the Debtor's revenue. Such a result could seriously jeopardize the Debtor's restructuring efforts and, ultimately, creditor recoveries.

Therefore, it is critical that Utility Services continue uninterrupted during the pendency of this Chapter 11 Case.

53. Historically, the Debtor has a good payment record with the Utility Providers. To the best of the Debtor's knowledge, there are no defaults or arrearages with respect to the undisputed invoices for prepetition Utility Services, other than payment interruptions that may be caused by the commencement of these chapter 11 cases. In the aggregate, the Debtor pays approximately $2,500.00 each month for Utility Services, calculated as the historical average payment for the 12-month period ending November 30, 2025.

### D. *Debtor's Motion for Entry of Interim and Final Orders Authorizing the Debtor to Pay Prepetition Claims of Certain Critical Vendors and Granting Related Relief*

54. The Debtor has identified approximately ten critical vendors (the "Critical Vendors") holding prepetition claims (the "Critical Vendor Claims") totaling approximately $150,000.00. These Critical Vendors provide either critical products or critical services to the Debtor, including services and products necessary for the Debtor to continue the development of its second-generation 3D construction printer as well as essential services.

55. The Critical Vendors provide goods and services that are so vital to the Debtor's businesses that the cessation of the delivery of such goods and services would jeopardize the Debtor's ability to operate and maximize the value for the sale of the Debtor as a going concern and are vendors that the Debtor cannot otherwise easily or quickly replace without significant time, disruption, or expense. Any material interruption in the provision of the goods or services provided by the Critical Vendors, however brief, could cause irreparable harm to the Debtor's go-forward businesses and the Debtor's intended sale as a going concern. Such harm would likely far outweigh the cost of payment of the Critical Vendor Claims. The Debtor intends to pay prepetition

Critical Vendor Claims only when, in its exclusive business judgment, the benefits to its estate from making such payments will exceed the costs to the Debtor's estate.

56. The Debtor relies upon employees of HISYS to provide certain technical services, including, design, engineering, research and development, creation and storage of intellectual property and manufacturing of certain machinery relating to the Debtor's 3D construction printers. The Debtor cannot immediately replace the services provided by HISYS, particularly in light of the integration between HISYS and the Debtor, and replacing the services provided by HISYS would likely diminish the Debtor's estate further because the costs of those services would likely be higher than what the Debtor pays HISYS, particularly if those services were provided domestically. The Debtor makes monthly transfers to HISYS of between $40,000 and $46,000 for overhead, payroll, and rent. Those transfers are booked on the Debtor's balance sheet as loans receivable from HISYS. The Debtor seeks authority to treat HISYS as a Critical Vendor and to pay approximately $80,000.00 in accrued prepetition amounts that were not transferred to HISYS when due.

Dated: December 26, 2025

________________________________

George Perry, in his capacity as Chief Executive Officer of Black Buffalo 3D Corporation