**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>BLACK BUFFALO 3D CORPORATION<br><br>Debtor.[1] | Chapter 11<br><br>Case No. 25-12270-TMH<br><br>**Objection Deadline: May 5, 2026 at 4:00 p.m. (ET)**<br>**Hearing Date: May 12, 2026 at 10:00 a.m. (ET)** |

**DEBTOR'S MOTION FOR ENTRY OF ORDERS: (I)(A) APPROVING BIDDING PROCEDURES AND PROTECTIONS IN CONNECTION WITH A SALE OF SUBSTANTIALLY ALL OF DEBTOR'S ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; (B) AUTHORIZING THE DEBTOR TO DESIGNATE A STALKING HORSE BID; (C) SCHEDULING AN AUCTION AND SALE HEARING; (D) APPROVING THE FORM AND MANNER OF NOTICE THEREOF; AND (E) APPROVING PROCEDURES RELATED TO ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND LEASES; (II)(A) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF DEBTOR'S ASSETS PURSUANT TO SUCCESSFUL BIDDER(S)' ASSET PURCHASE AGREEMENT(S), FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS; AND (B) APPROVING ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND LEASES; AND (III) GRANTING RELATED RELIEF**

Black Buffalo 3D Corporation (the "Debtor"), the debtor and debtor-in-possession in the above captioned chapter 11 case, through its undersigned counsel, moves (this "Motion") for entry of an order, substantially in the form attached to this Motion as **Exhibit A,** (I)(a) approving bidding procedures and protections in connection with a sale of substantially all of the Debtor's assets free and clear of liens, claims, encumbrances and interests; (b) approving the Debtor's designation of a stalking horse bid; (c) scheduling an auction and sale hearing; (d) approving the form and manner of notice of the auction and sale hearing; and (e) approving procedures related to the assumption and assignment of certain executory contracts and leases; (II)(a) authorizing the sale of

[1] The Debtor in this case, along with the last four digits of the Debtor's federal tax identification number, is: Black Buffalo 3D Corporation (5412). For purposes of this chapter 11 case, the Debtor's service address is: 1071 Hudson Street, Union, NJ 07083.

substantially all of Debtor's assets pursuant to a successful bidder's asset purchase agreement free and clear of liens, claims, encumbrances and other interests; and (b) approving assumption and assignment of certain executory contracts and leases; and (III) granting related relief.

## JURISDICTION AND VENUE

1. The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012. The Debtor confirms its consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The bases for the relief requested herein are sections 105, 363, 365 and 503 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9007 and 9014 of the Bankruptcy Rules, and Local Rules 2002-1 and 6004-1.

## Background

A. General Background

4. On December 24, 2025 (the "Petition Date"), the Debtor filed a voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code. The Debtor is operating its business and managing its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in this chapter 11 case, and no official committee of unsecured creditors has been appointed by the Office of the United States Trustee.

5. The Debtor has developed a propriety 3D construction printing process known as NEXCON™ and a proprietary structural construction ink formulation. The Debtor's products are intended to be used to 3D print structures up to three stories high and can print buildings, stand-up walls, or modular components faster and more cost effectively than framed lumber, precast, or block methods, at a fraction of the time and with a stronger, more resilient result. The Debtor is headquartered in Union, New Jersey.

6. Additional factual background regarding the Debtor, including its business operations, corporate and capital structure, and the events leading to the filing of this chapter 11 case is found in the *Declaration of George Perry in Support of Chapter 11 Petition and First Day Motions* [D.I. 9] (the "First Day Declaration"), filed on the Petition Date.[2] In addition to the First Day Declaration, this Motion is supported by the *Declaration of Michael Galego in Support of Motion for Interim and Final Authority to Obtain Post-Petition Financing and Use Cash Collateral* [D.I. 40] (the "DIP Declaration"), and the *Declaration of Michael Galego in Support of*

[2] Capitalized terms used but not defined in this Motion are defined in the First Day Declaration.

*Debtor's Motion for Approval of Bidding Procedures, Stalking Horse Protections and Related Relief* (the "Galego Declaration"), filed contemporaneously with this Motion.

B. The Pre-Petition Sale Process

7. Prior to the Petition Date, in the summer of 2025, the Debtor formed a special committee of the board of directors to explore strategic alternatives, including financing and acquisition transactions. In August 2025, the Debtor retained INFOR Financial Group ("INFOR")[3] to conduct a marketing process to either obtain financing for the Debtor or to sell the Debtor's assets to a strategic or financial purchaser. In connection with the prepetition marketing process, the Debtor established a confidential data room for potential investors or bidders. The Debtor also developed a teaser to be used as part of the marketing process.

8. Throughout the prepetition and post-petition period, the Debtor contacted all existing investors and lenders of the Debtor on multiple occasions to assess their willingness to provide additional capital. All such parties other than the current DIP Lender (as defined below) declined. INFOR also conducted targeted outreach to four strategic buyers within the Debtor's niche industry. However, the 3D construction printing industry has been experiencing challenges. Many industry participants remain in the fundraising and research and development phase, and are thus not likely or able to purchase the Debtor's assets or invest in the Debtor's business. Moreover, other previously-successful 3D construction printing businesses have experienced financial distress and attempted liquidations or sales over the past year, limiting buyer appetite. Further, as a largely pre-revenue technology company with existing debt obligations, the market of potentially-interested purchasers for the Debtor's business is small. The Debtor also contacted several venture capital entities seeking a potential investment or financing transaction, in addition

[3] The Debtor is not seeking to retain INFOR in this chapter 11 case.

to all of its equity holders and investors. No additional investments or financing transactions were available.

9. Unfortunately, the pre-petition sale process did not yield any offers to either finance or purchase the Debtor's business, other than the offer from the current DIP Lender. As discussed further in the First Day Declaration, the Debtor's existing equity holders declined to make further capital infusions into the Debtor, and the Debtor's existing lenders refused to extend further credit unless such credit was provided through a restructuring transaction.

C. Certain Pre-Petition Debt of the Debtor

10. Beginning on July 22, 2022, the Debtor entered into a series of loan transactions (the "AJA Loans") with AJA Holdings 2013 Inc ("AJA") governed by a Convertible Loan Agreement dated August 30, 2023. As of the Petition Date, the AJA Loans outstanding totaled $3,642,820.82, including accrued and unpaid interest (the "AJA Debt"). The AJA Debt is secured by a junior security interest in favor of AJA and a lien on substantially all of the assets of the Debtor ("AJA Lien"), excluding the Debtor's cash.

11. On August 3, 2023, the Debtor entered into a Convertible Loan Agreement with All Dimension Home Improvement & Restoration, Inc. ("All Dimension"), under which the Debtor borrowed a total principal amount of $434,351.78 (the "All Dimension Debt"). The All Dimension Debt is secured by a senior security interest in favor of All Dimension and a lien on substantially all of the assets of the Debtor ("All Dimension Lien"), excluding the Debtor's cash.

12. On October 11, 2025, the Debtor received a bridge loan in the amount of $500,000 ("Bridge Loan") from Buffalo OC1 Holdings LLC ("Bridge Lender") and subsequently entered into a Bridge Financing Agreement with Bridge Lender on November 18, 2025. The Bridge Loan is unsecured.

D. DIP Financing

13. To obtain funds necessary to maintain its operations during this chapter 11 case and to conduct the sale of its assets, the Debtor has obtained debtor-in-possession financing ("DIP Financing") from Black Buffalo JVCo LLC ("DIP Lender"), a joint venture between AJA and Bridge Lender. The Debtor filed a motion [D.I. 5] ("DIP Motion") seeking approval of the DIP Financing on December 26, 2025. Following an initial hearing on the DIP Motion held on December 29, 2025, the Debtor and DIP Lender renegotiated certain terms, resulting in an amended DIP term sheet (the "DIP Term Sheet") dated February 23, 2026, filed with the Bankruptcy Court on February 27, 2026 [D.I. 39].

14. Among other things, the DIP Term Sheet provides for: (1) up to $1,500,000 in new money DIP Financing from the DIP Lender; (2) a roll-up of the AJA Debt; (3) post-petition liens on substantially all of the Debtor's assets ("DIP Liens"); (4) consensual priming of the All Dimension Debt in favor of the DIP Liens; (5) the ability of the DIP Lender to credit bid the DIP Financing; and (6) certain milestones ("Milestones") that must be met by the Debtor, including:

a. Within 5 business days of the execution of the Amended Term Sheet (or such later date as the DIP Lender may agree), the Debtor shall enter into an asset purchase agreement (the "Stalking Horse APA") with the DIP Lender or a designee of the DIP Lender (the "Stalking Horse Bidder");

b. Within 10 business days of the execution of the Amended Term Sheet (or such later date as the DIP Lender may agree), the Debtor shall file a motion under Section 363 of the Bankruptcy Code ("Sale Procedures Motion"), in form and substance reasonably acceptable to the DIP Lender, requesting an order of the Court (i) approving bidding procedures (the "Bidding Procedures") for the Debtor to sell all or substantially all of its respective assets (the "Assets") to a purchaser, including the Stalking Horse Bidder, under an asset purchase agreement, in form and substance reasonably acceptable to the DIP Lender, subject to the receipt of "higher and better" bids (the "Approved Sale"); (ii) approving the Stalking Horse APA; and (iii) establishing a date for a hearing to approve the Approved Sale (the "Sale Hearing"). The Bidding Procedures shall specifically provide that the Debtor may solicit competing bids on its assets in bulk or by asset;

c. Within 28 days of filing the Sale Procedures Motion (or such later date as the DIP Lender may agree), Debtor shall obtain Bankruptcy Court approval, pursuant to an order (the "Bidding Procedures Order"), in form and substance reasonably acceptable to the DIP Lender, of the Bidding Procedures;

d. Within 45 days of filing the Sale Procedures Motion (or such later date as the DIP Lender may agree), Debtor shall conduct, as necessary and subject to Bankruptcy Court approval, an auction in accordance with the Bidding Procedures (the "Auction");

e. Within 48 days of filing the Sale Procedures Motion (or such later date as the DIP Lender may agree), subject to availability of the Bankruptcy Court, Debtor shall obtain Bankruptcy Court approval, in form and substance reasonably acceptable to the DIP Lender acting in good faith, of the Approved Sale to the successful bidder (the "Approved Sale Order"); and

f. Within 60 days after filing the Sale Procedures Motion (or such later date as the DIP Lender may agree), Debtor shall consummate the Approved Sale.

15. On March 4, 2026, the Bankruptcy Court entered the *Interim Order Granting Authority to Obtain Post-Petition Financing* [D.I. 45] (the "Interim DIP Order"), allowing interim funding under the DIP Financing of $500,000 and an initial roll-up of $500,000 of the AJA Debt. On March 24, 2026, the Bankruptcy Court entered an order approving the DIP Financing on a final basis [D.I. 69] (the "Final DIP Order"). The Final DIP Order approves $1.5 million in new money postpetition funding to the Debtor, and the roll-up of the remainder of the AJA Debt, subject to expiration of the Investigation Termination Date. *See* D.I. 69.

16. The Debtor and Stalking Horse Bidder have also negotiated the Stalking Horse APA, attached hereto as **Exhibit B**, pursuant to which the Stalking Horse Bidder has agreed to purchase substantially all of the Debtor's assets through a credit bid, assumption of certain liabilities, and cash payment of any amounts necessary to pay cure costs associated with any executory contracts or unexpired leases proposed to be assumed and assigned to the Stalking Horse Bidder in connection with the Sale.

E. The Proposed Bidding Procedures

17. Pursuant to Local Rule 6004-1(c), the material provisions of the Bidding Procedures are as follows:[4]

| | |
|---|---|
| **Provisions Governing Qualification of Bidders and Qualified Bids**<br>Local Rule 6004-1(c)(i)(A)-(B) | Each person or entity that desires to participate in the Auction process (each, a "Prospective Bidder") and seeks access to the Data Room must first deliver the following:<br><br>A. An executed confidentiality agreement in form and substance satisfactory to the Debtor (unless such party is already a party to an existing confidentiality agreement with the Debtor that is acceptable to the Debtor for this due diligence process, in which case such agreement shall govern); and<br><br>B. Sufficient information to allow the Debtor to determine that the interested party intends to access the Data Room for a bona fide purpose consistent with these Bidding Procedures and that such Prospective Bidder has the financial and managerial wherewithal to submit a Qualified Bid and to consummate the sale transaction(s) contemplated thereby.<br><br>To qualify as a "Qualified Bid," a Bid must be in writing and determined by the Debtor to satisfy the following requirements:<br><br>1. Identification of Bidder. A Qualified Bid must fully disclose the following: (a) the legal identity of each person or entity bidding for the applicable Assets and/or otherwise sponsoring, financing (including through the issuance of debt in connection with such Bid) or participating in (including through license or similar arrangement with respect to the Assets to be acquired in connection with such Bid) the Auction in connection with such Bid and the complete terms of any such participation; and (b) any past or present connections or agreements with the Debtor or its non-Debtor affiliates, the DIP Lender, any other known Prospective Bidder or Qualified Bidder, or any officer or director of any of the foregoing (including any current or former officer or director of the Debtor or its non-Debtor affiliates).<br><br>2. Purchased Assets. A Qualified Bid must identify the following: |

[4] In the event of a conflict between the summary contained in this Motion and the language of the Bidding Procedures, the Bidding Procedures shall control. All capitalized terms used in this summary but not defined herein have the meanings ascribed to them in the Bidding Procedures.

| | |
|---|---|
| | a. the Assets to be purchased (including any then-known executory contracts and unexpired leases) such Prospective Bidder wishes to bid on.<br>b. the liabilities (including applicable Cure Costs if any, to be assumed by the Prospective Bidder in the Sale Transaction), including any debt to be assumed; and<br>c. if a Bid is for less than the entire business, an allocation of the purchase price across the individual desired Assets.<br>3. Form of Consideration.<br>a. Credit Bidding. Pursuant to the Final DIP Order, the DIP Lender, or its designees, shall have the unqualified right at any time to credit bid on a dollar-for-dollar basis up to the full amount of the pre- and post-petition obligations in accordance with Section 363(k) of the Bankruptcy Code. The DIP Lender shall not be prohibited from making such any such credit bid "for cause" under Section 363(k) of the Bankruptcy Code; provided however that is a Qualified Bid is received from a bidder other than the Stalking Horse Bidder, the Court will have a post-Bid Deadline, pre-Auction hearing to determine the amount the AJA Debt the DIP Lender is permitted to credit bid (if any). Moreover, any Bid submitted by the DIP Lender shall be deemed to be a Qualified Bid, notwithstanding the requirements in these Bidding Procedures that a Bid must satisfy to be a Qualified Bid. For the avoidance of doubt, the DIP Lender shall be considered a Qualified Bidder and shall not be required to provide Good Faith Deposit.<br>b. Form of Consideration and Allocation. A Qualified Bid must propose a purchase price payable in cash and specified assumed liabilities. Bids proposing a purchase price other than in cash shall not be Qualified Bids.<br>4. Proposed Asset Purchase Agreement and Sale Order: A Qualified Bid must constitute a binding and irrevocable offer and be in the form of an asset purchase agreement reflecting the terms and conditions of the Bid (each, a "Proposed Asset Purchase Agreement"). A Proposed Asset Purchase Agreement shall: (a) be duly authorized and executed; (b) be based on, and |

| | |
|---|---|
| | marked against the Stalking Horse APA; (c) specify the proposed purchase price for the applicable Assets; and (d) identify any then-known Assigned Contracts proposed for or that may be proposed for assumption and assignment in connection with the proposed Sale Transaction.<br><br>5. Financial Information. A Qualified Bid must include the following:<br><br>a. a statement that the Prospective Bidder is financially capable of timely consummating the Sale Transaction contemplated by the Prospective Bidder's Proposed Asset Purchase Agreement;<br><br>b. sufficient evidence, as reasonably determined by the Debtor, to determine that the Prospective Bidder has, or can obtain, the financial wherewithal to timely consummate the Sale Transaction contemplated by the Prospective Bidder's Proposed Asset Purchase Agreement.<br><br>c. Adequate Assurance Information with respect to any Contracts included or that may be included in the Prospective Bidder's Bid.<br><br>6. Good Faith Deposit. Each Qualified Bid must be accompanied by a good faith deposit (each, a "Good Faith Deposit") in the form of cash (or other form acceptable to the Debtor in its sole discretion in an amount equal to ten percent (10%) of the proposed purchase price for the Assets. All Good Faith Deposits shall be deposited into a trust account maintained on behalf of the Debtor (and to be designated by Debtor) and handled in accordance with these Bidding Procedures. To the extent a Qualified Bidder increases the purchase price before, during, or after the Auction, the Debtor reserves the right to require that such Qualified Bidder adjust its Good Faith Deposit so that it equals ten percent (10%) of the increased purchase price. The Debtor reserves the right to increase or decrease the Good Faith Deposit for one or more Qualified Bidders in its sole discretion.<br><br>7. Adequate Assurance. A Qualified Bid must include evidence of the Prospective Bidder's (or any other relevant assignee's) ability to comply with Section 365 of the Bankruptcy Code (to the extent applicable), including providing adequate assurance of such Prospective Bidder's (or any other relevant assignee's) ability to perform future obligations arising under any Assigned Contracts included in its Bid. The Debtor may require the following Adequate Assurance Information in connection with demonstrating adequate assurance of future |

| | |
|---|---|
| | performance: information evidencing the Prospective Bidder's (or any other relevant assignee's) financial wherewithal and willingness to perform under any Assigned Contracts included in the Bid, which information may include: (i) a corporate organizational chart or similar disclosure identifying corporate ownership and control; (ii) financial statements; (iii) tax returns (iv) annual reports; and (v) summaries of the proposed assignee's experience in the industry. All Adequate Assurance Information must be in a form that will permit its immediate dissemination to the applicable Counterparties on a confidential basis.<br><br>8. Representations and Warranties. A Qualified Bid must include the following representations and warranties:<br><br>a. a statement that the Prospective Bidder has had an opportunity to conduct any and all due diligence regarding the Debtor's businesses and the Assets prior to submitting its Bid;<br><br>b. a statement that the Prospective Bidder has relied solely upon its own independent review, investigation and/or inspection of any relevant documents and the Assets in making its Bid and did not rely on any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied, by operation of law or otherwise, regarding the Debtor's businesses or the Assets or the completeness of any information provided in connection therewith;<br><br>c. a statement that all proof of financial ability to consummate the Sale Transaction in a timely manner and all information provided to support adequate assurance of future performance is true and correct; and<br><br>d. a statement that the Prospective Bidder agrees to be bound by the terms of the Bidding Procedures.<br><br>9. Authorization. A Qualified Bid must: (a) include evidence of authorization and approval from the Prospective Bidder's board of directors (or comparable governing body) with respect to the submission, execution and delivery of any bid for the Assets, participation in the Auction and closing of the Sale Transaction contemplated by the Prospective Bidder's proposed asset purchase agreement; or (b) if the Prospective Bidder is an entity formed for the purpose of effecting the proposed Sale Transaction, provide written evidence acceptable to the Debtor of |

| | |
|---|---|
| | authorization and the approval by the equity holder(s) of such Prospective Bidder.<br><br>10. Joint Bids. The Debtor will be authorized to approve joint Bids in its discretion on a case-by-case basis.<br><br>11. Other Requirements. A Qualified Bid must:<br><br>a. state that the Prospective Bidder agrees to serve as a backup bidder (a "Backup Bidder") if such bidder's Qualified Bid is selected at the Auction as the next highest or next best bid after the Successful Bid (as defined herein) for the Assets (each such bid, a "Backup Bid");<br><br>b. state that the Bid, as may be modified before or during the Auction, represents a binding, irrevocable, good-faith and bona fide offer to purchase the Assets and is not subject to or conditioned on any due diligence, financing, or other contingency (other than the conditions to closing under the applicable agreement), and is irrevocable until twenty-eight (28) days after entry of the Sale Order (the "Backup Bid Expiration Date");<br><br>c. expressly state and acknowledge that the Prospective Bidder shall not be entitled to a break-up fee, termination fee, expense reimbursement or other "bidding protection" in connection with the submission of a bid for the Assets or otherwise participating in the Auction or the Sale Transaction process, unless otherwise granted by the Debtor and approved by an order of the Court;<br><br>d. identify with particularity each and every condition to closing and all Contracts to be assumed and assigned;<br><br>e. state that the Prospective Bidder is committed to closing the Sale Transaction contemplated in its Bid as soon as practicable and in any case no later than fourteen (14) days after entry of the Sale Order;<br><br>f. specify (i) whether the Qualified Bidder intends to hire any of the Debtor's employees and (ii) the proposed treatment of the Debtor's prepetition compensation, incentive, retention, bonus or other compensatory arrangements, plans, or agreements, including offer letters, employment agreements, |

| | |
|---|---|
| | consulting agreements, retiree benefits, and any other employment related agreements (collectively, the "Employee Obligations");<br>g. expressly waive any claim or right to assert any substantial contribution administrative expense claim under Section 503(b) of the Bankruptcy Code or the payment of any broker fees or costs in connection with bidding for any of the Assets and/or otherwise participating in the Auction or the Sale Transaction process;<br>h. include a covenant to cooperate with the Debtor (i) to provide pertinent factual information regarding the Prospective Bidder's operations reasonably required to analyze issues arising with respect to any applicable antitrust laws and any other applicable regulatory requirements and (ii) to obtain Court approval of the Sale Transaction;<br>i. state or otherwise estimate the types of transition services, if any, the Prospective Bidder would require of and/or provide to the Debtor, including an estimate of the time any such transition services would be required of and/or provided to the Debtor, if the Prospective Bidder's Bid were selected as the Successful Bid for the applicable Assets;<br>j. certify that the Prospective Bidder did not collude with any other bidders and is not otherwise a partnership, joint venture or other entity in which more than one bidder (or any affiliates of a bidder) has a direct or indirect interest, unless consented to in writing by the Debtor;<br>k. include a covenant to comply with the terms of these Bidding Procedures and the Bidding Procedures Order; and<br>l. include contact information for the specific person(s) the Debtor should contact in the event they have any questions about the Prospective Bidder's Bid. |
| **Provisions Providing Bid Protections to Stalking Horse or Initial Bidder** Local Rule 6004-1(c)(i)(C) | In connection with the Stalking Horse APA with the Stalking Horse Bidder, upon the consummation of a sale of all or any portion of the Assets to any party other than the Stalking Horse Bidder or as otherwise provided in the Sale Order, the Debtor shall pay to the Stalking Horse Bidder a "break-up" fee equal to |

| | |
|---|---|
| | (i) three percent (3%) of the new money funded by the DIP Lender post-petition, forming a portion of the Credit Bid included in the Stalking Horse Bid plus (ii) reimbursement of all actual costs and expenses incurred by the Stalking Horse Bidder not to exceed $150,000 (collectively, the "Break-up Fee"). No bidder or any other party other than the Stalking Horse Bidder shall be entitled to any termination or "break-up" fee, expense reimbursement or any other bidding protections in connection with the submission of a bid for the Assets or for otherwise participating in the Auction or the Sale Transaction process, unless otherwise granted by the Debtor and approved by an order of the Court. |
| **Modification of Bidding and Auction Procedures**<br>Local Rule 6004-1(c)(i)(D) | The Debtor reserves the right to, in its business judgment, in a manner consistent with its fiduciary duties and applicable law, modify these Bidding Procedures, including to, among other things: (a) extend or waive deadlines or other terms and conditions set forth herein; (b) adopt new rules and procedures for conducting the bidding and Auction process; or (c) otherwise modify these Bidding Procedures to further promote competitive bidding for and maximizing the value of the Assets; provided that such extensions, waivers, new rules and procedures, accommodations and modifications (i) do not conflict with and are not inconsistent with the Bidding Procedures Order, these Bidding Procedures, the Bankruptcy Code, the Bankruptcy Rules, or any order of the Court; and (ii) are promptly communicated to each Qualified Bidder.<br><br>The Debtor may, in its sole discretion, among other things: (i) amend or waive the conditions precedent to qualifying as a Qualified Bidder; (ii) extend the Bid Deadline as to any party or with respect to any Assets; (iii) with respect to any Bid that is not a Qualified Bid, the Debtor may provide (but shall not be obligated to provide) the Bidder with the opportunity to remedy any deficiencies prior to the Auction; and/or (iv) postpone or cancel the Auction and terminate the proposed sale(s) for any Assets. |
| **Closing with Alternative Backup Bidders**<br>Local Rule 6004-1(c)(i)(E) | Immediately prior to the conclusion of the Auction, the Debtor will, (a) determine, in a manner consistent with these Bidding Procedures, which Qualified Bid is the Backup Bid and (b) notify all Qualified Bidders at the Auction of the identity of the Backup Bidder and the amount of the purchase price and other material terms of the Backup Bid. Within one (1) business day after the Auction, the Backup Bidder shall submit to the Debtor execution versions of the documentation memorializing the terms of the Backup Bid(s). |

| | |
|---|---|
| | A Backup Bid will remain binding on the applicable Backup Bidder until the Backup Bid Expiration Date. If the Sale Transaction with the applicable Successful Bidder is terminated prior to the Backup Bid Expiration Date, the Backup Bidder shall be deemed the new Successful Bidder and shall be obligated to consummate the Backup Bid as if it were the Successful Bid at the Auction; provided, that the Debtor may, in its business judgment and after providing notice to the Sale Notice Parties, elect not to pursue the Sale Transaction contemplated by the Backup Bid. |
| **Procedures Governing Auction**<br>Local Rule 6004-1(c)(ii) | The Auction shall be governed by the following procedures, subject to the Debtor's right to modify such procedures in its business judgment:<br>1. Baseline Bid. Prior to the commencement of the Auction, the Debtor will determine, in its business judgment, the highest and/or best Qualified Bid (each such Qualified Bid, a "Baseline Bid"). Bidding at the Auction shall commence at the amount of the Baseline Bid.<br>2. Sub-Auctions. The Debtor reserves the right to host Sub-Auctions for certain packages of Assets at its discretion (each such package an "Auction Package").<br>3. Minimum Overbid.<br>a. Bidding at the Auction will begin with the Baseline Bid and continue, in one or more rounds of bidding, so long as during each round at least one subsequent bid (a "Subsequent Bid") is submitted by a Qualified Bidder that (i) improves on such Qualified Bidder's immediately prior Qualified Bid and (ii) the Debtor determines is (A) for the first round, a higher or otherwise better offer than the Baseline Bid, and (B) for subsequent rounds, a higher or otherwise better offer than the Leading Bid (as defined herein).<br>b. At the Auction, Qualified Bidders may submit successive bids in increments of at least $50,000 greater than the prior bid (each, such Bid, a "Minimum Overbid"). The Debtor may, in its discretion announce increases or reductions to Minimum Overbids at any time during the Auction.<br>c. The initial overbid for the Assets subject to the Stalking Horse APA must be in an amount no less |

| | |
|---|---|
| | than the Stalking Horse Bid plus the Minimum Overbid plus the Break-up Fee.<br><br>d. Upon a Qualified Bidder's declaration of a Bid at the Auction, the Qualified Bidder must state on the record its commitment to pay within one (1) business days following the Auction, if such Bid were to be selected as the Successful Bid or as the Backup Bid, the incremental amount of the Qualified Bidder's Good Faith Deposit calculated based on the increased purchase price of such Bid (such Good Faith Deposit so increased, the "<u>Incremental Deposit Amount</u>") if applicable. Except as specifically set forth herein, for the purpose of evaluating the value of the consideration provided by any Bid subsequent to a Baseline Bid, the Debtor will at each round of bidding, consider and/or give effect to (a) any additional liabilities to be assumed by a Qualified Bidder under the Bid, including whether such liabilities are secured or unsecured, (b) any additional costs that may be imposed on the Debtor, and (c) the provision of any wind-down expenses, treatment of the obligations owed to the DIP Lender, and any additional outstanding debt, as applicable.<br><br>4. <u>Leading Bid</u>.<br><br>a. After the first round of bidding and between each subsequent round of bidding, the Debtor will announce the bid that it believes to be the highest or otherwise best offer (each such bid, a "<u>Leading Bid</u>") and describe the material terms thereof. Each round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the material terms of the Leading Bid, subject to the Debtor's authority to revise the Auction procedures to the extent permitted hereby.<br><br>b. The Auction or any Sub-Auction will be conducted by open bidding in the presence of all other Qualified Bidders and each Qualified Bidder shall have the right to be present for all rounds of open bidding and to submit additional Bids and make modifications to its Proposed Asset Purchase Agreement at the Auction to improve its Bid. However, to remain eligible to participate in |

| | |
|---|---|
| | subsequent rounds of bidding, each Qualified Bidder except the bidder that submitted the Leading Bid in the immediately prior round must submit a qualifying Subsequent Bid with respect to such round of bidding. If a Qualified Bidder that did not submit the Leading Bid in the immediately prior round fails to submit a qualifying Subsequent Bid, then such Qualified Bidder shall be disqualified from continuing to participate in the Auction. The Debtor may, in its business judgment, engage in discussions and negotiate with any and all Qualified Bidders participating in the Auction or Sub-Auction outside the presence of other bidders before each round of bidding, including to improve or clarify the terms of bids made.<br><br>c. The Debtor shall have the right to determine which Bid is the highest or otherwise best Bid and, in accordance with the terms of these Bidding Procedures, reject, at any time, without liability, any bid that the Debtor deems to be inadequate or insufficient, not in conformity with the requirements of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, these Bidding Procedures, any order of the Court, or the best interests of the Debtor and its estate.<br><br>d. The determination of which Qualified Bid(s) constitutes the Baseline Bid(s) and which Qualified Bid(s) constitutes the Successful Bid(s) shall take into account any factors the Debtor reasonably deems relevant to the value of the Qualified Bid(s) to the Debtor’s estate, which may include, among other things: (a) the type and amount of Assets sought to be purchased in the Bid; (b) the amount and nature of the total consideration; (c) the likelihood of the Bidder’s ability to close a transaction and the timing thereof; (d) the net economic effect of any changes to the value to be received by the Debtor’s estate from the transaction contemplated by the Baseline Bid; (e) the tax consequences of such Qualified Bid; (f) the assumption of obligations, including contracts and leases; (g) the cure amounts to be paid; and (h) the impact on employees, including the number of employees proposed to be transferred (to the extent such factor shall not |

| | |
|---|---|
| | negatively impact creditors); and employee-related obligations to be assumed.<br>5. Additional Auction Procedures.<br>a. The Debtor may announce at the Auction or a specific Sub-Auction additional procedural rules (e.g., among other things, the amount of time to make Subsequent Bids, the amount of the Minimum Overbid, or the requirement that parties submit "best and final" Bids) for conducting the Auction or specific Sub-Auction or otherwise modify the Bidding Procedures; provided, that such rules (i) are not materially inconsistent with the Bidding Procedures Order, the Bidding Procedures, the Bankruptcy Code, or any order of the Bankruptcy Court; and (ii) are disclosed to each Qualified Bidder during the Auction or Sub-Auction.<br>b. Any Bid for any Assets included in any Auction Package shall be subject to a determination by the Debtor, in its business judgment and in accordance with the other provisions of these Bidding Procedures, that (i) a Bid for substantially all of the Debtor's Assets and/or (ii) a combination of Bids that groups the Assets together differently, is the highest or otherwise best offer for such Assets. |

18. The Debtor requests that the Bidding Procedures Order establish the following dates and deadlines subject to extension and other modifications by the Debtor:

| EVENT | DATE |
|---|---|
| Bidding Procedures Hearing | May 12, 2026 at 10:00 a.m. (prevailing Eastern time) |
| Service of Bidding Procedures Order and Sale Notice | Two (2) business days after entry of Bidding Procedures Order |
| Deadline for the Debtor to file and Serve the Assumption and Assignment Notice | Two (2) business days after entry of Bidding Procedures Order |
| Deadline for the Debtor to Publish Publication Notice | Five (5) business days after entry of the Bidding Procedures Order |

| | |
|---|---|
| Contract Objection Deadline (objections related to Cure Costs and assumption and assignment (except with respect to adequate assurance of future performance)) | May 19, 2026 at 4:00 p.m. (prevailing Eastern time) |
| Sale Objection Deadline | May 19, 2026 at 4:00 p.m. (prevailing Eastern time) |
| Bid Deadline | May 19, 2026 at 4:00 p.m. (prevailing Eastern time) |
| Deadline for the Debtor to Serve Adequate Assurance | May 20, 2026 |
| Pre-Auction Hearing (if competing Qualified Bid) | May 21, 2026 |
| Auction | May 22, 2026 at 10:00 a.m. (prevailing Eastern time) |
| Deadline to File Notice of Auction Results | May 22, 2026 |
| Post-Auction Objection Deadline | May 26, 2026 at 4:00 p.m. (prevailing Eastern time) |
| Adequate Assurance Objection Deadline | May 26, 2026 at 4:00 p.m. (prevailing Eastern time) |
| Sale Hearing | May 29, 2026 at 10:00 a.m. (prevailing Eastern time) |
| Deadline to Consummate Approved Sale Transactions | May 31, 2026 |
| Backup Bid Expiration Date | Thirty (30) days after entry of the Sale Order |

## A. The Sale Notice

19. The Sale Notice sets forth (i) a description of Assets available for sale pursuant to the Bidding Procedures; (ii) the date, time and location of the Auction and Sale Hearing; and (iii) the Sale Objection Deadline and Post-Auction Objection Deadline and the procedures for filing such objections.

20. The Debtor will file the Sale Notice within two (2) business days after entry of the Bidding Procedures Order, and serve it on the following parties (collectively, the "Sale Notice Parties"): (a) counsel to the DIP Lender; (b) all persons and entities known by the Debtor to have asserted any lien, claim, interest, or encumbrance in the Assets (for whom identifying information and addresses are available to the Debtor); (c) all parties (each, a "Counterparty") to any Contract that may be assumed or assumed and assigned; (d) any governmental authority known to have a

claim against the Debtor in this Case; (e) the Office of the United States Trustee; (f) the Federal Trade Commission; (g) the Bureau of Consumer Protection; (h) all applicable federal, state and local taxing authorities, including the Internal Revenue Service; (i) the United States Attorney's Office for the District of Delaware; (j) the United States Attorney General's Office for the District of Delaware; (k) the Office of the Attorney General and the Secretary of State in each state in which the Debtor operates; (l) all of the parties entitled to notice pursuant to Bankruptcy Rule 2002; and (m) all other parties as directed by the Court.

21. Moreover, within five (5) business days after entry of the Bidding Procedures Order, or as soon as reasonably practicable thereafter, the Debtor will cause the information contained in the Sale Notice to be published once in *The Wall Street Journal* (national edition), or a similar regional or national publication (the "Publication Notice").

22. The Debtor submits that the foregoing notices comply fully with Bankruptcy Rule 2002 and are reasonably calculated to provide timely and adequate notice of the Bidding Procedures, the Auction, and the Sale Hearing to the Debtor's creditors and other parties in interest.

**B. Stalking Horse APA**

23. Following extensive, good-faith negotiations, the Debtor and the Stalking Horse Bidder agreed to the terms of the Stalking Horse APA. The Stalking Horse APA contemplates the Stalking Horse Bidder's acquisition of the Assets.

24. The following table sets forth a summary of the material terms and conditions of the Stalking Horse APA, including required disclosures under Local Rule 6004-1(b)(iv):[5]

| | |
|---|---|
| **Seller/Debtor** | Black Buffalo 3D Corporation |
| **Stalking Horse Bidder** | Black Buffalo JVCo LLC (the "Purchaser") |

5 If there are any inconsistencies between the summary set forth herein and the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern.

| | |
|---|---|
| **Purchased Assets** [*See* Stalking Horse APA, § 2.1(b)] | The term "Purchased Assets" means all of the properties, assets and rights of the Debtor (other than the Excluded Assets) existing as of the Closing, including the following:<br><br>all equipment, machinery, forklifts, vehicles, fixtures, furniture, furnishings, computer hardware, 3D printing machines, replacement parts, and other tangible personal property owned by the Debtor whether or not located on or at the Leased Real Property and whether or not used or held for use in the Business, as set forth on Schedule 2.1(b)(i) (collectively, the "Tangible Personal Property");<br><br>all inventory, including 3D printing machines, replacement parts, cement-based ink and materials for making such ink, supplies and packaging materials that, as of the close of business on the Closing Date, is used or held for use in the Business whether or not located at the Leased Real Property (the "Inventory");<br><br>all trademarks, patents, copyrights and domain names and other IP Rights of the Debtor, including those listed on Schedule 2.1(b)(iii), and all rights of action and remedies for past, present and future infringements of any of the foregoing (the "Purchased Intellectual Property");<br><br>all of the Debtor's equity interest in and amounts owing to the Debtor by (A) HISYS Co., Ltd., a company existing under the laws of the Republic of Korea, (B) any other subsidiary of the Debtor identified by the Purchaser prior to Closing;<br><br>all avoidance actions or similar causes of action arising under sections 544 through 553 of the Bankruptcy Code, including any proceeds thereof;<br><br>all of the Contracts to which the Debtor is a party (A) including those that are set forth on Schedule 2.1(b)(vi), (B) that are unexpired as of the Closing Date (including those Contracts that have been previously unrenewed) and (C) that have not been rejected (or are the subject of a notice of rejection or a pending rejection motion) by the Debtor at the express written direction of the Purchaser prior to Closing (the "Purchased Contracts");<br><br>all accounts receivable, including but not limited to collection of any judgments in favor of the Debtor, a list of which is set out in Schedule 2.1(b)(vii) as of the date of this Agreement, and without limiting the foregoing, all cash payments received following the date of this Agreement and all securities in and rights to any amounts owing to the Debtor or any of its subsidiaries by Alquist 3D LLC, including in respect of the convertible promissory note financing with Alquist 3D LLC, any preferred units issued thereunder, any claim or judgment against Alquist 3D LLC, including the decision and order of the Supreme Court of the State of New York County of Nassau – Commercial Division Part 7 dated April 28, 2025 |

| | |
|---|---|
| | and entered May 5, 2025, whether or not relating to such financing or preferred units, and all proceeds therefrom received by the Debtor following the date of this Agreement;<br><br>the leasehold interest of the Debtor in and to the Leased Real Property together with the Debtor's interest in all fixtures and leasehold improvements located at the Leased Real Property and, for the avoidance of doubt, the security deposit(s) under the Leases in respect of such Leased Real Property;<br><br>all books and all books of account, financial records and statements, personnel records of Transferred Employees, historic documents relating to the Purchased Assets, sales and purchase records, cost and pricing information, customer and supplier files, research and development records, production records, equipment logs and all other documents, files, correspondence and other information of the Debtor relating to the Business or the Purchased Assets;<br><br>all claims of the Debtor relating to the Business or the Purchased Assets, whether choate or inchoate, known or unknown, contingent or otherwise, including under warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent related to the Purchased Assets;<br><br>all prepaid expenses and deposits relating to the Business or the Purchased Assets, including post-petition adequate assurance deposits provided to utilities and any deposits provided to suppliers or service providers to the Debtor on a prepetition or post-petition basis (collectively, the "Chapter 11 Deposits") except to the extent solely relating to an Excluded Asset or Excluded Liability;<br><br>to the extent assignable under applicable Law, all consents and authorizations, permits and licenses of any Governmental Body, or pursuant to Section 2.7 by an order of the Bankruptcy Court which has been granted, pertaining to the Business or the Purchased Assets; and<br><br>the goodwill of the Business, including the right of the Purchaser to (i) represent itself as carrying on the Business in continuation of the Debtor, and (ii) use any words indicating that the Business is so carried on, including all of the Debtor's rights in the name "Black Buffalo 3D" or any variation of it, together with the rights, if any, in telephone and facsimile numbers, e-mail addresses and internet domain names used in connection with the Business. |

| | |
|---|---|
| **Sale to Insider**<br>Local Rule 6004-1(b)(iv)(A) | The Stalking Horse Bidder is not an insider of the Debtor and owns no interests in the Debtor.<br><br>The Stalking Horse Bidder at all times, has been represented by separate counsel in negotiations resulting in entry into the Stalking Horse APA. |
| **Consideration**<br>[*See* Stalking Horse APA, § 3.1] | The aggregate consideration for the Purchased Assets (the "Purchase Price") will be:<br><br>One Million Five-Hundred Thousand Dollars ($1,500,000.00) representing One Million Five-Hundred Thousand Dollars ($1,500,000.00) of the DIP Financing (the "Credit Bid");<br><br>the Assumed Cure Costs (the "Cash Amount"); and<br><br>the assumption of:<br><br>all Liabilities arising, except as set forth below, on or after the Closing from the ownership or operation of the Purchased Assets by Purchaser;<br><br>all Liabilities of the Debtor under the Purchased Contracts that arise on or after the Closing Date, and not relating to any default existing prior to, or as a consequence of, Closing;<br><br>any Assumed Cure Costs that Purchaser is required to pay pursuant to Section 2.5;<br><br>all Liabilities of the Debtor under or associated with any permit, license, approval, certification, order or other right granted by any Governmental Body included in the Purchased Assets arising or relating to the period following Closing and not relating to any default existing prior to, or as a consequence of, Closing; and<br><br>all Liabilities listed on Schedule 2.3(g). |
| **Closing Deadline**<br>Local Rule 6004-1(b)(4)(D) | May 31, 2026 |
| **Record Retention**<br>Local Rule 6004-1(b)(4)(J) | Purchased Assets includes "all books and all books of account, financial records and statements, personnel records of Transferred Employees, historic documents relating to the Purchased Assets, sales and purchase records, cost and pricing information, customer and supplier files, research |

| | |
|---|---|
| [*See* Stalking Horse APA, §§ 2.1(b)(ix), 2.2(d)] | and development records, production records, equipment logs and all other documents, files, correspondence and other information of the Debtor relating to the Business or the Purchased Assets." Excluded Assets includes "any minute books, stock ledgers, corporate seals and stock certificates of the Debtor, and other similar books and records that the Debtor is required by Law to retain, including Tax Returns and financial statements, except that the Debtor will provide copies of all or any portions of such retained books and records requested by the Purchaser." |
| **Sale of Avoidance Actions**<br>Local Rule 6004-1(b)(4)(K)<br>[*See* Stalking Horse APA, § 2.1(b)(v)] | Purchased Assets includes "all avoidance actions or similar causes of action arising under sections 544 through 553 of the Bankruptcy Code, including any proceeds thereof." |
| **Credit Bid**<br>Local Rule 6004-1(b)(4)N)<br>[*See* Stalking Horse APA, §§ 3.1, 3.2] | Pursuant to the Final DIP Order, the DIP Lender, or its designees, shall have the unqualified right at any time to credit bid on a dollar-for-dollar basis up to the full amount of the pre- and post-petition obligations in accordance with Section 363(k) of the Bankruptcy Code. The DIP Lender shall not be prohibited from making such any such credit bid "for cause" under Section 363(k) of the Bankruptcy Code; provided however that is a Qualified Bid is received from a bidder other than the Stalking Horse Bidder, the Court will have a post-Bid Deadline, pre-Auction hearing to determine the amount the AJA Debt the DIP Lender is permitted to credit bid (if any). |
| **Relief from Fed. R. Bankr. P. 6004(h)**<br>Local Rule 6004-1(b)(4)(O) | The Debtor will seek relief from Fed. R. Bankr. P. 6004(h) in connection with entry of the Sale Order. |

## C. <u>Assumption and Assignment Procedures</u>

25. The Debtor requests that the Court approve the following Assumption and Assignment Procedures:

a. Assumption and Assignment Notice. Within two (2) days of entry of the Bidding Procedures Order, the Debtor shall serve a notice (the "Assumption and Assignment Notice") which will: (i) identify the Debtor's Contracts; (ii) provide the amounts, costs, or expenses that the Debtor believes must be paid or actions or obligations that must be performed or satisfied pursuant to the Bankruptcy Code to effectuate the assumption and assignment of such Contract (each a "Cure Cost" and, collectively, the "Cure Costs"); (iii) inform Counterparties of the requirement to file a Contract Objection (defined below) by the Contract Objection Deadline (defined below); and (iv) advise Counterparties of the procedures related to Adequate Assurance Objections (defined below).

b. Service of the Assumption and Assignment Notice. The Debtor shall serve the Assumption and Assignment Notice by first class mail or hand delivery or e-mail on the Sale Notice Parties.

c. Contract Objections. Any objection to any Cure Cost set forth on the Assumption and Assignment Notice or to the assumption and assignment of a Contract to a Successful Bidder by any Counterparty (except with respect to adequate assurance of future performance) (collectively, a "Contract Objection"), must: (i) be in writing; (ii) state the basis for such objection with specificity; (iii) if it contests any Cure Cost set forth in the Cure Notice, state with specificity what amounts, costs, or expenses the Contract Counterparty believes must be paid or actions or obligations must be performed or satisfied pursuant to the Bankruptcy Code to effectuate the assumption by the Debtor and the assignment to a Successful Bidder (in all cases with appropriate documentation in support thereof); (iv) comply with the Bankruptcy Rules and the Local Rules; (v) be filed with the Court on or before May 19, 2026 at 4:00 p.m. (prevailing Eastern time) (the "Contract Objection Deadline"), and (vi) be served on or before the Contract Objection Deadline upon (collectively, the "Objection Notice Parties"): (1) Counsel for the Debtor: Ballard Spahr LLP, 222 Delaware Avenue, 10th Floor, Wilmington, DE, 19801, Attn: Laurel D. Roglen (roglenl@ballardspahr.com) and Nicholas J. Brannick (brannickn@ballardspahr.com); (2) counsel for the DIP Lender, Norton Rose Fulbright Canada LLP, 222 Bay Street, Suite 3000, Toronto, ON M5K 1E7 Canada, Attn: Eric Reither (eric.reither@nortonrosefulbright.com) and Julie Harrison (julie.harrison@nortonrosefulbright.com), and Womble Bond Dickinson (US) LLP, 1313 North Market Street, Suite 1200, Wilmington, DE 19801, Attn: Matthew Ward (matthew.ward@wbd-us.com); (3) counsel to All Dimension, Moritt Hock & Hamroff LLP, 400 Garden City Plaza, 2nd Floor, Garden City, NY 11530, Attn: Theresa A. Driscoll (tdriscoll@moritthock.com); and (4) The Office of the U.S. Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801, Attention: Joseph J. McMahon, Jr. (Joseph.McMahon@usdoj.gov).

d. Adequate Assurance Information. The Debtor shall serve the Adequate Assurance Information of all Qualified Bidders to applicable Counterparties by no later than May 20, 2026. Any Counterparty that receives any Adequate Assurance Information with respect to any Qualified Bidder shall review such information on a confidential basis, shall not disclose such information to any party, and shall not use the Adequate Assurance Information for any purpose other than: (a) evaluating whether adequate assurance of future performance as required under the Bankruptcy Code has been provided; and (b) to support an objection to adequate assurance by such Counterparty.

e. Adequate Assurance Objection Deadline. The deadline for a Counterparty to object to assumption and assignment on the grounds of adequate assurance of future performance (each, an "Adequate Assurance Objection") shall be May 26, 2026 at 4:00 p.m. (prevailing Eastern time) (the "Adequate Assurance Objection Deadline"). An Adequate Assurance Objection must: (a) be in writing; (b) state the basis for such objection with specificity; (c) comply with the Bankruptcy Rules and the Local Rules; (d) be filed with the Court; and (e) be served on the Objection Notice Parties by no later than the Adequate Assurance Objection Deadline.

f. Hearing. If a Contract Objection or Adequate Assurance Objection is timely filed and received and the applicable parties are unable to consensually resolve the dispute or the amount to be paid under section 365 of the Bankruptcy Code, if any, such objection will be determined at a hearing to be requested by the Debtor or a Successful Bidder. At the Successful Bidder's discretion, the hearing regarding the Contract Objection or Adequate Assurance Objection may be set after the Sale Hearing.

g. Effect of Failure to Object. If a Counterparty fails to file a Contract Objection or Adequate Assurance Objection by the relevant deadlines: (a) the Counterparty will be deemed to have consented to the assumption and assignment of the Contract; (b) the Counterparty will be forever barred and estopped from asserting any objection to the propriety or effectiveness of the assumption and assignment of the Contract against the Debtor, a Successful Bidder, any assignee of the Contract, or the property of any of them; (c) the Cure Cost set forth on the Assumption and Assignment Notice for such Contract shall be controlling and the Counterparty will be deemed to have consented thereto, notwithstanding anything to the contrary in the Contract or otherwise; and (d) the Contract Counterparty will be forever barred and estopped from objecting to the Cure Cost or asserting any claims against the Debtor, any Successful Bidder, any assignee of the Contract, or the property of any of them.

h. Notice of Assigned Contracts. As soon as reasonably practicable after the Sale Hearing, the Debtor will file a notice containing the list of Assigned Contracts to be assumed and assigned to any Successful Bidder(s).

## **RELIEF REQUESTED**

26. By this Motion, the Debtor first seeks entry of an order:

a. approving the Bidding Procedures attached to this Motion as **Exhibit 1**;

b. approving the form of Stalking Horse APA and the Debtor's execution thereof, attached hereto as **Exhibit 2**;

c. scheduling the Auction and Sale Hearing;

d. approving the form and manner of notice of the Auction and Sale Hearing ("Sale Notice"), attached as **Exhibit A** to the Bidding Procedures;

e. approving procedures ("Assumption and Assignment Procedures") for the assumption and assignment of executory contracts and unexpired leases ("Contracts"), and the notice of potential assumption and assignment of Contracts ("Assumption and Assignment Notice"), attached as **Exhibit B** to the Bidding Procedures; and

f. granting related relief.

27. Second, following the Sale Hearing, the Debtor seeks entry of an order:

a. authorizing the sale of the Assets free and clear of all liens, claims, encumbrances and interests, according to the terms of the APA executed by the Debtor and Successful Bidder;

b. authorizing the assumption and assignment of certain Contracts to be identified by the Successful Bidder ("Assigned Contracts"); and

c. granting related relief.

## BASIS FOR RELIEF REQUESTED

### A. The Bidding Procedures and Relief Sought in the Bidding Procedures Order are in the Best Interest of the Estate and Should Be Approved

28. Section 363 of the Bankruptcy Code and Bankruptcy Rule 6004(f)(1) authorize debtors to sell property outside the ordinary course of business by private sale or by auction. Specifically, section 363(b) of the Bankruptcy Code provides that "[t]he [debtor in possession], after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate," and Bankruptcy Rule 6004(f)(1) provides that "sales not in the ordinary course of business may be . . . by private auction." Moreover, Section 105(a) of the Bankruptcy Code empowers bankruptcy courts to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

29. The procedures to be used in selling estate assets are subject to a debtor's business judgment, which is entitled to substantial deference so long as the debtor articulates an adequate business justification. *Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999).

30. The Bidding Procedures are specifically designed to promote what courts have deemed to be the paramount goal of any proposed sale of property of a debtor's estate: maximizing the value of sale proceeds received by the estate. *See In re Edwards*, 228 B.R. 552, 361 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate"); *Burtch v. Ganz (In re Mushroom Transp. Co.)*, 382 F.3d 325, 339 (3d Cir. 2004) (finding that a debtor had a fiduciary duty to maximize and protect the value of the estate's assets); *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564-65 (8th Cir. 1997) (recognizing that a main goal of any proposed sale of property of a debtor's estate is to maximize value).

31. Courts uniformly recognize that procedures established for the purpose of enhancing competitive bidding are consistent with the fundamental goal of maximizing the value of a debtor's estate. *See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 536-37 (3d Cir. 1999) (noting that bidding procedures that promote competitive bidding provide a benefit to a debtor's estate); *Official Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res. Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (observing the benefit of sale procedures that "encourage bidding and . . . maximize the value of the debtor's assets").

32. Ultimately, any Successful Bid(s), after being subject to a "market check" in the form of the Auction and accepted by the Debtor in the exercise of its reasonable business judgment, will constitute the highest or otherwise best offer for the Assets and will provide a greater recovery for its estate than any known or practically available alternative. *See, e.g.*, *In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. Apr. 2, 2001) (while a "section 363(b) sale transaction does not require an auction procedure . . . the auction procedure has developed over the years as an effective means for producing an arm's-length fair value transaction").

33. The Debtor has structured the Bidding Procedures to promote active bidding by interested parties and to confirm the highest or otherwise best offer reasonably available for the Assets through an orderly, uniform, and appropriately competitive process. Specifically, the Bidding Procedures encourage participation by financially capable bidders with demonstrated ability to consummate a timely transaction, provide such capable bidders with sufficient time to conduct necessary diligence and submit well-informed bids, and allow the Debtor to conduct the

Auction in a fair and transparent manner that ensures the Debtor are maximizing the value of the Assets.

34. Although the Debtor has not hired an investment banker in connection with the Bid Process, given the involvement of an investment banker in the Debtor's prepetition marketing process and the specialized nature of the Debtor's business, the Debtor believes, in its business judgement, that the Bid Procedures will maximize value for the estates by not incurring the additional cost of an investment banker. Moreover, courts in this District have not required debtors to retain an investment banker as a condition to approval of bid procedures. *See, e.g.*, *In re Charter School Capital,* No. 25-11016 (CTG), D.I. 171 (Bankr. D. Del. Jul. 26, 2025) (approving a sale of substantially all of the debtor's assets to the stalking horse bidder where the total consideration was $80,651,347.00 and where the debtor did not retain an investment banker); *In re KTRV LLC*, No. 25-10601 (MFW), D.I. 401 & 402 (Bankr. D. Del. Jun. 25, 2025) (approving the sale of substantially all of the debtors' assets following a competitive multi-day auction, that resulted in the estate receiving aggregate sale proceeds of $21,651,000.00 where the debtors did not retain an investment banker); *In re Blank Label Grp., Inc.*, No. 23-10286 (JTD), D.I. 154 (Bankr. D. Del. May 25, 2023) (approving a sale of substantially all of the debtors' assets, where the debtor did not retain an investment banker and there were competing bids with aggregate sale proceeds of $1,250,000.00); *In re Medly Health Inc.,* No. 22-11257, D.I. 365 (Bankr. D. Del. Feb. 7, 2023) (approving a sale of substantially all of the debtors' assets for aggregate sale proceeds of $19,350,000.00 where the debtors did not retain an investment banker); *In re PWR Invest, LP*, No. 19-11164 (JTD), D.I. 571 (Bankr. D. Del. Jun. 29, 2020) (approving a sale to debtors' stalking horse for $30,000,000.00 in aggregate sale proceeds where the debtors did not retain an investment banker); *In re Beavex Holding Corp.*, No. 19-10316 (LSS), D.I. 241 (Bankr. D. Del. Apr. 17, 2019)

(approving a sale of all the debtors' assets to purchasers for $8,304,487 in total consideration following on a sale process that was run without an investment banker).

35. Finally, the Bidding Procedures are consistent with procedures previously approved in this District. *See, e.g.*, *In re MRRC Hold Co.*, No. 24-11164 (CTG) (Bankr. D. Del. Jul. 10, 2024); *In re SIO2 Medical Products, Inc.*, No. 23-10366 (JTD) (Bankr. D. Del. Apr. 25, 2023); *In re Lucira Health, Inc.*, No. 23-10242 (MFW) (Bankr. D. Del. Mar. 27, 2023); *In re Performance Powersports Grp. Holdings, Inc.*, No. 23-10047 (LSS) (Bankr. D. Del. Feb. 27, 2023); *In re Alex & Ani, LLC*, No. 21-10918 (CTG) (Bankr. D. Del. Jul. 16, 2021); *In re Bluestem Brands, Inc.*, No. 20-10566 (MFW) (Bankr. D. Del. Jun. 3, 2020); *In re Bertucci's Holdings, Inc.*, Case No. 1810894 (MFW) (Bankr. D. Del. May 7, 2018); *In re Saladworks*, Case No. 15-10327 (LSS) (Bankr. D. Del. Mar. 12, 2015).

36. Moreover, the amount of the Break-up Fee is reasonable and consistent with the size of other bid protections approved in cases in this District. *See In re Beavex Holding*, Case No. 19-10316 (Bankr. D. Del. Mar. 14, 2019) (approving break up fee and expense reimbursement that is 4.5% of the purchase price); *In re Activecare, Inc., et al.,* No. 18-11659 (Bankr. D. Del. Aug. 17, 2018) (approving break up fee that is 3% of the purchase price); *In re Vertullus Specialties, Inc.*, No. 16-11290 (Bankr. D. Del. Jun. 28, 2016) (approving break up fee of 3% of the purchase price and unlimited expense reimbursement); *In re deCode Genetics,* No. 09-14063 (Bankr. D. Del. Dec. 11, 2009) (approving break up fee of 3% of the purchase price and an expense reimbursement of $500,000 for a total of 6.5% of the purchase price in the aggregate).

37. Moreover, if the Debtor is authorized to enter into the Stalking Horse APA, the Debtor will ensure that they obtain fair market value for the Assets by setting a minimum purchase

price for interested parties to submit competing bids. The Debtor therefore submits that it should be authorized to enter into the Stalking Horse APA.

38. Accordingly, in the exercise of its business judgment, the Debtor submits that the Bidding Procedures should be approved because they are reasonable, appropriate, and will ensure the Debtor receives the highest and best price for the Assets.

**B. <u>The Break-up Fee is Appropriate Under the Circumstances</u>**

39. Approval of the Break-up Fee is governed by standards for determining the appropriateness of bid protections in the bankruptcy context. Courts have identified at least two instances in which bid protections may benefit the estate. First, a break-up fee may be necessary to preserve the value of a debtor's estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *In re O'Brien Envtl. Energy, Inc.*, 181 F.3d at 537. Second, if the availability of a break-up fee was to induce a bidder to research the value of the debtor and convert the value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id.*; *see also In re Reliant Energy Channelview LP*, 594 F.3d 200, 206-08 (3d Cir. 2010) (reasoning that a break-up fee should be approved if it is necessary to entice a party to make the first bid or if it would induce a stalking horse bidder to remain committed to a purchase).

40. In *O'Brien*, the Third Circuit reviewed the following nine factors set forth by the lower court as relevant in deciding whether to award a break-up fee:

a. the presence of self-dealing or manipulation in negotiating the break-up fee;

b. whether the fee hampers, rather than encourages, bidding;

c. the reasonableness of the break-up fee relative to the purchase price;

d. whether the unsuccessful bidder placed the estate property in a "sale configuration mode" to attract other bidders to the auction;

e. the ability of the request for a break-up fee to serve to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders or attract additional bidders;

f. the correlation of the fee to a maximum value of the debtor's estate;

g. the support of the principal secured creditors and creditors' committees of the break-up fee;

h. the benefits of the safeguards to the debtor's estate; and

i. the substantial adverse impact of the break-up fee on unsecured creditors, where such creditors are in opposition to the break-up fee.

*See O'Brien,* 181 F.3d at 536.

41. While none of the factors are dispositive, an application of the facts of this case supports the approval of the Break-up Fee. In particular, the Debtor believes that the Break-up Fee is necessary to retain the Stalking Horse Bidder and to establish an adequate floor price for the Assets. Without the Break-up Fee, the Debtor might lose the opportunity to obtain the highest or otherwise best offer for the Assets and would certainly lose the downside protection that is be afforded by the existence of the Stalking Horse Bidder.

42. Moreover, the amount of the Break-up Fee is reasonable and consistent with the size of other break-up fees approved in cases in this District. *See In re Beavex Holding*, Case No. 19-10316 (Bankr. D. Del. Mar. 14, 2019) (approving break up fee and expense reimbursement that is 4.5% of the purchase price); *In re Activecare, Inc., et al.,* No. 18-11659 (Bankr. D. Del. Aug.

17, 2018) (approving break up fee that is 3% of the purchase price); *In re Vertullus Specialties, Inc.*, No. 16-11290 (Bankr. D. Del. June 28, 2016) (approving break up fee of 3% of the purchase price and unlimited expense reimbursement); *In re deCode Genetics,* No. 09-14063 (Bankr. D. Del. Dec. 11, 2009) (approving break up fee of 3% of the purchase price and an expense reimbursement of $500,000 for a total of 6.5% of the purchase price in the aggregate).

43. In sum, the Break-up Fee is reasonable under the circumstances as the Stalking Horse Bid will enable the Debtor to maximize the value for its Assets while setting a minimum purchase price for the Assets that will be tested in the marketplace. As such, creditors of the Debtor's estate can be assured that the consideration obtained will be fair and reasonable and at or above the market.

### C. **The Proposed Form and Manner of Notice of the Auction and Sale Hearing is Appropriate.**

44. Under Bankruptcy Rule 2002(a) and (c), the Debtor is required to provide notice of the proposed sale of the Assets, and such notice must include a disclosure of the time and place of any public sale, and the deadlines for filing any objections.

45. As set forth herein, the Sale Notice provides: (i) a description of the Assets available for sale pursuant to terms set forth in the Bidding Procedures; (ii) the date, time, and place of the Auction and the Sale Hearing, and (iii) the deadlines and procedures for filing relevant objections. The Debtor will file and serve the Sale Notice within two (2) business days of entry of the Bidding Procedures Order upon the Sale Notice Parties, whom are inclusive of all interested parties or those otherwise entitled to notice of the sale of the Assets.

46. Additionally, within five (5) days after entry of the Bidding Procedures Order, the Debtor will cause the Publication Notice to be published once in *The Wall Street Journal* (national

edition), or a similar regional or national publication in order to provide notice to any other potential interested parties.

47. The Debtor submits that notice of this Motion and Bidding Procedures Hearing, coupled with service of the Sale Notice, the Assumption and Assignment Notice, and publication of the Publication Notice, constitutes good and adequate notice of the sale of the Assets and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002.

48. The Debtor further submits that the proposed notice procedures are designed to maximize the chance of obtaining the broadest possible participation in the Debtor's marketing process, while minimizing costs to the estate. Accordingly, the Debtor respectfully requests that the Court find that the proposed notice procedures set forth in this Motion are sufficient, and that no other or further notice of the relief requested herein is required.

**D. The Assumption and Assignment Procedures Are Appropriate and Should Be Approved.**

49. In accordance with the Bidding Procedures, the Debtor believes it is necessary to establish the Assumption and Assignment Procedures to provide certainty to the Debtor, any Successful Bidders, and Counterparties of its obligations and rights with respect to the Contracts.

50. The Debtor submits that the Assumption and Assignment Procedures provide for the orderly assumption and assignment of Assigned Contracts to a Successful Bidder. Further, the Assumption and Assignment Notice provides Counterparties with necessary information relating to the Cure Costs, the Adequate Assurance Information, and the procedures to object to assumption and assignment of their Contract on those bases.

51. As set forth above, the Debtor requests that the Assumption and Assignment Procedures provide that any Counterparty that fails to object to the proposed assumption and

assignment of their Contract be deemed to consent to assumption and assignment of such Contract pursuant to section 365 of the Bankruptcy Code. Such relief is necessary to ensure applicable Contracts may be orderly assumed and assigned and should be granted. *See, e.g.*, *In re Boy Scouts of Am.*, 642 BR 504, 569 (Bankr. D. Del. 2022) ("The lack of objection of a [creditor] is also consensual for purposes of § 363 and, again, permissible under § 363(f)(2)."); *In re Tabone, Inc.*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (same); *Pelican Homestead v. Wooten (In re Gabel)*, 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same).

52. The Debtor believes that the Assumption and Assignment Procedures are fair and reasonable, provide sufficient notice to parties to Contracts, and provide certainty to all parties in interest regarding their obligations and rights in respect thereof. Accordingly, the Debtor requests that the Court approve the Assumption and Assignment Procedures set forth herein and in the Bidding Procedures Order.

### E. <u>The Sale Should Be Approved as an Exercise of Sound Business Judgment</u>

53. Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Courts will approve a sale of the debtor's assets if such sale is based upon the sound business judgment of the debtor. *See In re Del. & Hudson Ry. Co.*, 124 B.R. 169 (D. Del. 1991); *In re Martin*, 91 F.3d at 395 (citing *Fulton State Bank v. Schipper (In re Schipper)*, 933 F.2d 513 (7th Cir. 1991)); *Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983).

54. Courts consider the following factors in determining whether a proposed sale satisfies this standard: (a) whether a sound business justification exists for the sale; (b) whether adequate and reasonable notice of the sale was provided to interested parties; (c) whether the sale

will produce a fair and reasonable price for the property; and (d) whether the parties have acted in good faith. *See Del. & Hudson Ry. Co.*, 124 B.R. at 176 (adopting *Lionel* factors to determine whether a sound business justification exists for the sale in this District); *Lionel Corp.*, 722 F.2d at 1071 (setting forth the "sound business purpose" test); *In re Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987).

55. Once a debtor demonstrates a valid business justification for its decision to sell property outside the ordinary course of business, it is presumed that "in making a business decision the directors of the corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *In re Integrated Resources*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1983)); *In re Filene's Basement, LLC*, No. 11-13511 (KJC), 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014) ("If a valid business justification exists, then a strong presumption follows that the agreement at issue was negotiated in good faith and is in the best interests of the estate.") (citations omitted). "Courts are loathe to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence." *Integrated Resources*, 147 B.R. at 656.

**i. *A Sound Business Purpose Exists for the Sale of the Assets and the Sale Is Proposed in Good Faith***

56. A sound business purpose for the sale of a debtor's assets outside the ordinary course of business may be found where such a sale is necessary to preserve the value of assets for the estates, creditors, or interest holders. *See, e.g.*, *In re Abbotts Dairies of Pa, Inc.*, 788 F.2d 143 (3d Cir. 1986); *In re Lionel Corp.*, 722 F.2d at 1071.

57. The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. *See, e.g.*, *Mushroom Transp. Co., Inc.*, 382 F.3d at 339; *Food Barn Stores*, 107 F.3d at 564-65 (in bankruptcy sales, "a primary objective of the Code [is] to

enhance the value of the estate at hand"); *Integrated Resources*, 147 B.R. at 659 ("It is a well-established principle of bankruptcy law that the objective of bankruptcy rules and the [Debtor's] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate") (quoting *Cello Bag Co. Inc. v. Champion Int'l Corp. (In re Atlanta Packaging Prods., Inc.)*, 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988)). "'As long as [the sale] appears to enhance a debtor's estate, court approval of a debtor's decision to [sell] should only be withheld if the debtor's judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code . . . .'" *GBL Holding Co., Inc. v. Blackburn/Travis/Cole, Ltd. (In re State Park Bldg. Grp., Ltd.)*, 331 B.R. 251, 255 (N.D. Tex. 2005) (quoting *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985).

58. Here, a strong business justification exists because a sale of the Assets is necessary to preserve the value of such assets for the Debtor's estate, creditors, and other parties in interest. As set forth herein and in the First Day Declaration and Galego Declaration, the Debtor explored out-of-court restructuring, refinancing, and sale options prior to the commencement of this case. Unfortunately, such efforts did not generate actionable interest and the Debtor thereafter determined that this chapter 11 case and sale process were the only avenue to preserve the Debtor's business as a going concern and to generate any value for the benefit of its creditors and estate. Consequently, the sale of the Assets is supported by good business reasons and is proposed by the Debtor in good faith.

**ii.** ***Adequate and Reasonable Notice of the Sale Will Be Provided***

59. Adequate and reasonable notice of the sale of the Assets will be provided through the Sale Notice. As discussed herein, the Sale Notice will provide the Sale Notice Parties with all information relevant to the sale of the Assets, the Auction, the Sale Hearing, and the procedures related thereto.

60. Significantly, the form and manner of the Sale Notice will have been approved by this Court pursuant to the Bidding Procedures Order, after notice and a hearing, before it is served on parties in interest.

**iii. *__The Sale Will Produce a Fair Price for the Assets__***

61. The Debtor has engaged, and will continue to engage, in a targeted marketing and sale process directed at generating interest in the Debtor's Assets to maximize the value to the Debtor's estate.

62. Accordingly, the fairness and reasonableness of the consideration to be paid for the Assets will be demonstrated by adequate "market exposure" and an open and fair auction process—the best means for establishing whether a fair and reasonable price is being paid. *See Bank of Am. Nat'l Trust & Sav. Ass'n. v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999); *see also In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, *4 (Bankr. D. Del. Apr. 2, 2001) (while a "Section 363(b) sale transaction does not require an auction procedure . . . the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction.").

63. Specifically, the Bidding Procedures were designed to facilitate a robust and competitive bidding process and provide the Debtor with significant flexibility to do so. The Debtor also constructed the Bidding Procedures to promote transparency, good faith, and fairness throughout the entire sale process within the parameters of the Milestones. The Bidding Procedures provide an appropriate framework for the Debtor to review, analyze, and compare one or more bids for the Assets and to engage with bidders on an arm's-length basis to work to improve the quality of their bids for the benefit of all parties in interest.

64. The Debtor will market its assets and solicit other offers consistent with the Bidding Procedures, including, for example, by contacting potentially interested parties as well as parties

that were contacted during the prepetition marketing process, by continuing to provide acceptable bidders with data room access and requested information, and otherwise by making all efforts to maximize the value of the Assets. In this way, the Debtors will ensure that the Successful Bidder's purchase price will, conclusively, be fair value.

## F. <u>The Successful Bidder(s) Should Be Entitled to the Protections of Section 363(m) of the Bankruptcy Code</u>

65. Section 363(m) of the Bankruptcy Code protects a good-faith purchaser's interest in property purchased from the debtor's estate notwithstanding that the sale conducted under section 363(b) is later reversed or modified on appeal. Specifically, section 363(m) states that:

> The reversal or modification on appeal of an authorization under [section 363(b)] . . . does not affect the validity of a sale . . . to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale were stayed pending appeal.

11 U.S.C. § 363(m).

66. Section 363(m) "fosters the 'policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon which third parties rely.'" *In re Abbotts Dairies*, 788 F.2d at 147; *Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal"); *In re Stein & Day, Inc.*, 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("pursuant to 11 U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale on appeal unless there is a stay pending appeal").

67. The Debtor submits that the Stalking Horse, or any Successful Bidder, will be a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code, and the

applicable asset purchase agreement(s) will be good-faith agreement(s) on arm's-length terms entitled to the protections of section 363(m).

68. Any Successful Bidder will be an entity making an arms-length, good faith bid following a competitive marketing process, and will be selected by the Debtor in accordance with the Bidding Procedures. Therefore, the Debtor intends to request at the Sale Hearing a finding that the Successful Bidder is a good faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code.

### G. <u>The DIP Lender or its Designee Should Be Authorized to Credit Bid Pursuant to Section 363(k) of the Bankruptcy Code</u>

69. A secured creditor is allowed to "credit bid" the amount of its claims in a sale of assets in which it has a security interest. Section 363(k) of the Bankruptcy Code provides, in relevant part, that unless the court for cause orders otherwise, the holder of a claim secured by property that is the subject of the sale "may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property." 11 U.S.C. § 363(k). Even if a secured creditor is undersecured as determined in accordance with section 506(a) of the Bankruptcy Code, section 363(k) of the Bankruptcy Code allows such secured creditor to bid the total face value of its claim and does not limit the credit bid to the creditor's economic value. *See In re Submicron Sys. Corp.*, 432 F.3d 448, 459-60 (3d Cir. 2006) (explaining that "[i]t is well settled . . . that creditors can bid the full face value of their secured claims under section 363(k)").

70. In this District, absent cause for restriction on credit bidding, courts have consistently ruled in favor of reserving a secured creditor's right to credit bid its claim. *See In re Source Home Entm't, LLC*, No. 14-115533 (KG) (Bankr. D. Del. Jul. 21, 2014) (order approving Bidding Procedures which authorized parties with secured claims to credit bid); *In re PTC Alliance*

*Corp.*, No. 09-13395 (Bankr. D. Del. Nov. 6, 2009) (order authorizing, but not directing, the administrative agent to credit bid); *In re Hayes Lemmerz Int'l, Inc.*, No. 09-11655 (Bankr. D. Del. Sept. 22, 2009) (order authorizing interested party to exercise its right under Bankruptcy Code section 363(k) to make a credit bid); *In re Foamex Int'l Inc.*, No. 09-10560, (Bankr. D. Del. May 27, 2009) (order authorizing the sale of substantially all of the debtor's assets in a $155 million credit bid over a $151.5 million all-cash bid); *see also Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.)*, 432 F.3d 448, 459-60 (3d Cir. 2006) (citations omitted).

71. Here, the DIP Lender has valid secured claims against the Debtor and is entitled to credit bid some or all of the claims secured by its collateral pursuant to section 363(k) of the Bankruptcy Code. Moreover, the Final DIP Order provides that DIP Lender may credit bid up to the full amount of the pre- and post-petition obligations in the event of a sale of the Debtor's businesses; *provided, however*, that in the event a competing Qualified Bid is received in accordance with the Bidding Procedures, there shall be a pre-Auction hearing to determine (i) the aggregate amount that the DIP Lender is permitted to credit bid, if any, beyond the "new money" funded post-petition pursuant to the Final DIP Order; and (ii) the calculation of the Break-Up Fee as approved pursuant to the Bidding Procedures Order; *provided further* that nothing limits or otherwise affects the provisions of the Final DIP Order with respect to the "roll-up" or the investigation rights.

72. Accordingly, the Debtor submits that the Court should authorize DIP Lender (or its designee) to submit a credit bid for the Assets.

**H. <u>The Sale of the Assets Free and Clear of Liens, Claims and Other Interests Is Authorized By Section 363(f)</u>**

73. Pursuant to section 363(f) of the Bankruptcy Code, a debtor in possession may sell property of the estate "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:

a. applicable nonbankruptcy law permits sale of such property free and clear of such interests;

b. such entity consents;

c. such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;

d. such interest is in bona fide dispute; or

e. such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

74. This provision is supplemented by Section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). This equitable power may be utilized to effectuate the provisions of section 363(f*). See, e.g.*, *In re Trans World Airlines, Inc.*, 2001 WL 1820325 (highlighting bankruptcy courts' equitable authority to authorize sale of estate assets free and clear).

75. Because Section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Assets "free and clear" of liens and interests. *See, e.g.*, *In re Dura Automotive Sys., Inc.*, No. 06-11202, 2007 WL 7728109 n.32 (Bankr. D. Del. Aug. 15, 2007); *Michigan Employment Sec. Comm'n v.*

*Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (section 363(f) of the Bankruptcy Code is written in the disjunctive, thus a court may approve the sale "free and clear" provided at least one of the subsections of Bankruptcy Code section 363(f) is met); *Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (Bankr. E.D. Pa. 1988) (because section 363(f) is written in the disjunctive, a court may approve a "free and clear" sale even if only one of the subsections is met); *In re Bygaph, Inc*., 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same).

76. The Debtor believes that one or more of the tests of Section 363(f) of the Bankruptcy Code will be satisfied with respect to the sale of the Assets. As set forth herein, the Stalking Horse Bidder, which is the Debtor's DIP Lender, has submitted a credit bid up to the full amount of the pre- and post-petition obligations, and any overbid by a Successful Bidder would need to exceed that amount. Accordingly, the Debtor submits that either or both of Section 363(f)(2) and (3) of the Bankruptcy Code will be satisfied, and the Debtor requests it be permitted to sell the Assets free and clear of all liens, claims, encumbrances and all other interests. The Debtor further requests that any holder of a lien, claim, encumbrance or other interest related to the Assets that fails to object to the relief sought herein by the Sale Objection Deadline be deemed to consent to the transfer of the Assets free and clear.

77. Moreover, the Debtor submits that it is appropriate to sell the Assets free and clear of successor liability relating to the Debtor's businesses. Such a provision ensures that a Successful Bidder is protected from any claims or lawsuits premised on the theory that the Successful Bidder is a successor in interest to the Debtor. Courts have consistently held that a buyer of a debtor's assets pursuant to a sale under section 363 of the Bankruptcy Code takes free from successor liability relating to the debtor's business. *See, e.g.*, *In re Trans World Airlines,*

*Inc.,* 322 F.3d at 288-89 (sale of assets pursuant to section 363(f) barred successor liability claims for employment discrimination and rights under travel voucher program); *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 585 (4th Cir. 1996) (affirming the sale of debtors' assets free and clear of certain taxes); *In re General Motors Corp.,* 407 B.R. 463, 50506 (Bankr. S.D.N.Y. 2009) (holding that "the Court will permit GM's assets to pass to the purchaser free and clear of successor liability claims, and in that connection, will issue the requested findings and associated injunction."); *In re Chrysler LLC,* 405 B.R. 84, 111 (Bankr. S.D.N.Y. 2009) *("in personam* claims, including any potential state successor or transferee liability claims against New Chrysler, as well as *in rem* interests, are encompassed by section 363(f) and are therefore extinguished by the Sale Transaction."); *see also WBQ P'ship v. Commonwealth of Virginia Dep't of Medical Assistance Servs*., 189 B.R. 97, 103 (Bankr. E.D. Va. 1995) (approving sale of debtor's assets under section 363(f) and precluded governmental entity from collecting depreciation recapture arising from such sale from the purchaser); *P.K.R. Convalescent Ctrs., Inc. v. Commonwealth of Virginia, Dep't of Medical Assistance Serv. (In re P.K.R. Convalescent Ctrs., Inc.)*, 189 B.R. 90, 94 (Bankr. E.D. Va. 1995) (same); *Am. Living Sys. v. Bonapfel (In re All Am. of Ashburn, Inc.)*, 56 B.R. 186, 189-90 (Bankr. N.D. Ga. 1986) (sale pursuant to section 363(f) barred successor liability for product defect claims), *aff'd*, 805 F.2d 1515 (11th Cir. 1986); *Rubinstein v. Alaska Pac. Consortium (In re New England Fish Co.)*, 19 B.R. 323, 328 (Bankr. W.D. Wash. 1982) (sale pursuant to section 363(f) was free and clear of successor liability claims for employment discrimination and civil rights violations); *Folger Adam Security v. DeMatteis/MacGregor JV*, 209 F.3d 252, 258 (3d Cir. 2000) (citing *Leckie* for the proposition that the debtors "could sell their assets under § 363(f) free and clear of successor liability that otherwise would have arisen under federal statute").

78. The purpose of an order purporting to authorize the transfer of assets free and clear of all liens, claims, encumbrances and all other interests would be frustrated if claimants could thereafter use the transfer as a basis to assert claims against a purchaser arising from a seller's presale conduct. Moreover, without such assurances, the Debtor would run the risk that potential bidders may not enter the Auction or, if they did, would do so with reduced bid amounts. To that end, a Successful Bidder should not be liable under any theory of successor liability relating to the Debtor's businesses, but should hold the purchased Assets free and clear.

## I. <u>The Assumption and Assignment of Contracts Should Be Approved</u>

79. Section 365(a) of the Bankruptcy Code provides that, subject to the court's approval, a trustee "may assume or reject any executory contracts or unexpired leases of the debtor." 11 U.S.C. § 365(a).

80. Upon finding that a trustee has exercised its sound business judgment in determining to assume an executory contract or unexpired lease, courts will approve the assumption under section 365(a) of the Bankruptcy Code. The standard applied by the Third Circuit in determining whether an executory contract or unexpired lease should be assumed is the "business judgment" test, which requires a debtor to determine that the requested assumption or rejection would be beneficial to its estate. *See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989); *see also NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984) (describing business judgment test as "traditional") (superseded in part by 11 U.S.C. § 1113). Courts generally will not second-guess a debtor's business judgment concerning the assumption of an executory contract. *See In re Decora Indus., Inc.*, No. 00-4459, 2002 WL 32332749, at *8 (D. Del. May 20, 2002); *Off'l Comm. for Unsecured Creditors v. Aust (In re Network Access Solutions, Corp)*, 330 B.R. 67, 75 (Bankr. D. Del. 2005) ("The standard for approving the

assumption of an executory contract is the business judgment rule"); *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006) ("The propriety of a decision to reject an executory contract is governed by the business judgment standard"); *see also Phar Mor, Inc. v. Strouss Bldg. Assocs.*, 204 B.R. 948, 952 (N.D. Ohio 1997) ("Courts should generally defer to a debtor's decision whether to reject an executory contract") (citation omitted).

81. A debtor's decision to assume or reject an executory contract or expired lease will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment. *See, e.g.*, *Grp. of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pac. Ry. Co.*, 318 U.S. 523 (1943) (applying Bankruptcy Act section 77(b), predecessor to Bankruptcy Code section 365, and rejecting a test of whether an executory contract was burdensome in favor of determining whether rejection is within the debtor's business judgment); *see also Sharon Steel,* 872 F.2d at 40 (describing deference to a debtor's business judgment as "breathing space afforded [to] the debtor to consider whether to reject or assume executory contracts under the Code").

82. Here, the Court should approve the decision to assume and assign the Assigned Contracts in connection with the sale of the Debtor's Assets as a sound exercise of the Debtor's business judgment. The Assigned Contracts are necessary to operate the businesses and, as such, they are essential to inducing the best offer for the Assets. Second, it is unlikely that any purchaser would want to acquire the Assets unless a significant number of the contracts and leases needed to manage the day-to-day operations were included in the transaction. Finally, the Assigned Contracts will be assumed and assigned through the Assumption and Assignment Procedures approved by the Court pursuant to the Bidding Procedures Order and, thus, will such procedures will have been by key constituents in the Case.

83. Accordingly, the Debtor submits that the assumption and assignment of the Assigned Contracts by way of the Assumption and Assignment Procedures should be approved as a valid exercise of its business judgment.

**i. *Defaults Under the Assigned Contracts Will Be Cured Through the Sale Transactions***

84. Upon finding that a debtor has exercised its business judgment in determining that assuming an executory contract is in the best interest of its estate, courts must then evaluate whether the assumption meets the requirements of section 365(b) of the Bankruptcy Code, specifically that a debtor (a) cure, or provide adequate assurance of promptly curing, prepetition defaults in the executory contract, (b) compensate parties for pecuniary losses arising therefrom, and (c) provide adequate assurance of future performance thereunder. Section 365 of the Bankruptcy Code "attempts to strike a balance between two sometimes competing interests, the right of the contracting nondebtor to get the performance it bargained for and the right of the debtor's creditors to get the benefit of the debtor's bargain." *In re Carlisle Homes, Inc.*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (citation omitted).

85. The Debtor submits that the statutory requirements of section 365(b)(1)(A) of the Bankruptcy Code will be promptly satisfied. Because the Assumption and Assignment Procedures (once approved) provide a clear process by which to resolve disputes over cure amounts or other defaults, the Debtor is confident that if defaults exist that must be cured, such cure will be achieved fairly, efficiently, and properly, consistent with the Bankruptcy Code and with due respect to the rights of non-debtor parties.

**ii. *The Counterparties Will Be Adequately Assured of Future Performance***

86. Similarly, the Debtor submits that the third requirement of section 365(b) of the Bankruptcy Code—adequate assurance of future performance—is also satisfied given the facts

and circumstances present here. "The phrase 'adequate assurance of future performance' was adopted from Uniform Commercial Code Section 2-609" and is to be given a practical, pragmatic construction based upon the facts and circumstances of each case. *In re U.L. Radio Corp.*, 19 B.R. 537, 542 (Bankr. S.D.N.Y. 1982). Although no single solution will satisfy every case, the degree of assurance necessary falls considerably short of an absolute guaranty. *In re Decora Indus., Inc.*, No. 00-4459, 2002 WL 32332749, at *8 (D. Del. May 20, 2002) (citing *In re Prime Motor Inns, Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994)). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986).

87. The Debtor believes that it can and will demonstrate that the requirements for assumption and assignment of the Assigned Contracts to the Successful Bidder(s) will be satisfied. As required by the Bidding Procedures, all bidders must provide Adequate Assurance Information to the Debtor to participate in the Auction. The Debtor will evaluate such Adequate Assurance Information relating to the financial wherewithal of potential bidders before designating such party as a Qualified Bidder (*e.g.*, financial credibility, willingness, and ability of the interested party to perform under the Assigned Contracts) and will demonstrate such financial wherewithal, willingness, and ability to perform under the Assigned Contracts assigned to the Successful Bidder to the relevant Counterparties. Further, the Assumption and Assignment Procedures provide the Court and other interested parties ample opportunity to evaluate and, if necessary, challenge the ability of any Successful Bidder(s) to provide adequate assurance of future performance and object to the assumption of the Assigned Contracts or proposed Cure Costs. The Court therefore should have a sufficient basis to authorize the Debtor to assume and assign the Assigned Contracts.

**J. <u>Relief from the Fourteen Day Waiting Period Under Bankruptcy Rules 6004(h) and 6006(d) Is Appropriate</u>**

88. Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6006(d). The Debtor requests that the Sale Order be effective immediately by providing that the fourteen (14) day stay under Bankruptcy Rules 6004(h) and 6006(d) are waived.

89. The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006. Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen (14) day stay period, Collier suggests that the fourteen (14) day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 9A COLLIER ON BANKRUPTCY ¶ 6004.11 (16th ed. 2025). Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. *Id*.

90. To maximize the value received for the assets and to satisfy the terms and Milestones, the Debtor seeks to close the sale of the Assets on or before May 31, 2026. Accordingly, the Debtor requests that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

**NOTICE**

91. Notice of this Motion shall be given to the following parties or, in lieu thereof, to their counsel, if known: (a) Counsel to the DIP Lender; (b) Counsel to All Dimension, (c) all persons and entities known by the Debtor to have asserted any lien, claim, interest or encumbrance in the Assets (for whom identifying information and addresses are available to the Debtor); (d) Counterparties to any Contract that may be assumed or rejected; (e) any governmental authority known to have a claim against the Debtor in this Case; (f) the Office of the United States Trustee; (g) the Federal Trade Commission; (h) the Bureau of Consumer Protection; (i) all applicable federal, state and local taxing authorities, including the Internal Revenue Service; (j) the United States Attorney's Office for the District of Delaware; (k) United States Attorney General's Office for the District of Delaware; (l) the Office of the Attorney General and the Secretary of State in each state in which the Debtor operates; (m) all of the parties entitled to notice pursuant to Bankruptcy Rule 2002; and (n) all other parties as directed by the Court. The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

**NO PRIOR REQUEST**

92. The Debtor has not previously sought the relief requested herein from this or any other Court.

WHEREFORE, the Debtor respectfully requests entry of the Bidding Procedures Order, substantially in the form attached hereto as **Exhibit A**, the Sale Order upon the Sale Hearing, and grant such other and further relief as may be appropriate and proper.

Dated April 21, 2026
Wilmington, Delaware

**BALLARD SPAHR LLP**

*/s/ Laurel D. Roglen*
Laurel D. Roglen (No. 5759)
Nicholas J. Brannick (No. 5721)
222 Delaware Avenue, 10th Floor
Wilmington, DE 19801
Telephone: (302) 252-4465
E-mail: roglenl@ballardspahr.com
E-mail: brannickn@ballardspahr.com

*Counsel to the Debtor and Debtor in Possession*