# EXHIBIT B

# ASSET PURCHASE AGREEMENT

**by and among**

**BLACK BUFFALO 3D CORPORATION**

**and**

**BLACK BUFFALO JVCO LLC**

**Dated as of April [●], 2026**

# TABLE OF CONTENTS


**Page**

I. DEFINITIONS ..... 1

1.1 Certain Definitions ..... 1
1.2 Terms Defined Elsewhere in this Agreement ..... 5
1.3 Other Definitional and Interpretive Matters ..... 6

II. PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES ..... 8

2.1 Purchase and Sale of Assets ..... 8
2.2 Excluded Assets ..... 9
2.3 Assumption of Liabilities ..... 10
2.4 Excluded Liabilities ..... 11
2.5 Cure Amounts ..... 11
2.6 Rejection of Contracts ..... 11
2.7 Non-Assignment of Assets ..... 12
2.8 Further Conveyances and Assumptions ..... 13

III. CONSIDERATION; ADJUSTMENT ..... 13

3.1 Consideration ..... 13
3.2 Payment of Purchase Price ..... 13
3.3 Apportionments ..... 13
3.4 Withholding ..... 14

IV. CLOSING AND TERMINATION ..... 14

4.1 Closing Date ..... 14
4.2 Deliveries by the Debtor ..... 14
4.3 Deliveries by Purchaser ..... 14
4.4 Termination of Agreement ..... 15
4.5 Procedure Upon Termination ..... 16
4.6 Effect of Termination ..... 16

V. REPRESENTATIONS AND WARRANTIES OF THE DEBTOR ..... 16

5.1 Incorporation, Status and Authorization of Agreement ..... 16
5.2 Conflicts; Consents of Third Parties ..... 17
5.3 Reserved ..... 17
5.4 Title to Purchased Assets ..... 17
5.5 Proceedings ..... 17
5.6 No Other Agreement to Purchase ..... 18
5.7 Reserved ..... 18
5.8 Financial Advisors ..... 18
5.9 No Other Representations or Warranties; Schedules ..... 18

VI. REPRESENTATIONS AND WARRANTIES OF PURCHASER ..... 18

6.1 Organization and Good Standing ..... 18
6.2 Authorization of Agreement ..... 18
6.3 Conflicts; Consents of Third Parties ..... 19
6.4 Financial Advisors ..... 19
6.5 Financial Capability ..... 19
6.6 Condition of the Purchased Assets ..... 20

VII. BANKRUPTCY COURT MATTERS ..... 20

7.1 Bankruptcy Court Filings ..... 20
7.2 Bankruptcy Process ..... 20
7.3 Approval ..... 20
7.4 Stalking Horse Bidder ..... 20
7.5 Auction ..... 20

VIII. COVENANTS ..... 21

8.1 Access to Information ..... 21
8.2 Actions Pending the Closing ..... 21
8.3 Consents; Approvals ..... 21
8.4 Further Assurances ..... 22
8.5 Employees and Employee Benefits ..... 22

IX. CONDITIONS TO CLOSING ..... 23

9.1 Conditions Precedent to Obligations of Purchaser ..... 23
9.2 Conditions Precedent to Obligations of the Debtor ..... 23
9.3 Conditions Precedent to Obligations of Purchaser and the Debtor ..... 24
9.4 Frustration of Closing Conditions ..... 24

X. TAXES ..... 24

10.1 Transfer Taxes ..... 24
10.2 Purchase Price Allocation ..... 25
10.3 Certain Periodic Non-Income Taxes ..... 25
10.4 Cooperation and Audits ..... 26

XI. MISCELLANEOUS ..... 26

11.1 No Survival of Representations and Warranties ..... 26
11.2 Expenses ..... 26
11.3 Submission to Jurisdiction; Consent to Service of Process ..... 27
11.4 Waiver of Right to Trial by Jury ..... 27
11.5 Entire Agreement; Amendments and Waivers ..... 27
11.6 Governing Law ..... 28
11.7 Notices ..... 28
11.8 Severability ..... 29
11.9 Assignment ..... 29

11.10 Non-Recourse ........................................................................................ 29
11.11 Counterparts ........................................................................................ 29
11.12 Time Is of the Essence ........................................................................................ 29

<u>Schedules</u>

A – Bidding Procedures Order
B – Sale order
2.1(b)(i) – Tangible Personal Property
2.1(b)(iii) – Purchased Intellectual Property
2.1(b)(vi) – Purchased Contracts
2.1(b)(vii) – Accounts Receivable
2.3(g) – Assumed Liabilities

# ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of April [●], 2026 (the "Effective Date"), by and among Black Buffalo JVCo LLC (the "Purchaser"), a Delaware limited liability company, and Black Buffalo 3D Corporation, a Delaware corporation (the "Company" or the "Debtor").

## RECITALS:

A. The Debtor is a debtor under title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code"), and filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on December 24, 2025, in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), where the Debtor's bankruptcy case is pending under Case No. 25-12270 (TMH) (the "Bankruptcy Case");

B. The Debtor is engaged in the business of owning and operating a 3D construction printing business (the "Business");

D. The Debtor, on behalf of itself and its estate, desires to sell to Purchaser the Purchased Assets and transfer to Purchaser the Assumed Liabilities, and Purchaser desires to purchase from the Debtor, the Purchased Assets and assume the Assumed Liabilities, in each case upon the terms and conditions hereinafter set forth and subject to and in accordance with the approval of the Bankruptcy Court under the Sale Order; and

D. The Parties desire to consummate the proposed transaction following the Bankruptcy Court's entry of the Sale Order as provided in this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual promises herein made and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the Parties, intending to be legally bound, agree as follows:

## I. DEFINITIONS

1.1 Certain Definitions. For purposes of this Agreement, each of the following terms, when used herein with initial capital letters, has the meaning specified in this Section 1.1 or in the other Sections of this Agreement identified in Section 1.2:

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly, controls, is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Bidding Procedures Motion" means the Debtor's Motion, in a form and substance acceptable to the Purchaser, for Entry of Orders: (i)(A) Approving Bidding Procedures and Protections In Connection with a Sale of Substantially All of Debtor's Assets Free and Clear of Liens, Claims, Encumbrances and Interests; (B) Authorizing the Debtor to Designate a Stalking Horse Bid; (C) Scheduling an Auction and Sale Hearing; (D) Approving the Form and Manner of

Notice Thereof; and (E) Approving Procedures Related to Assumption and Assignment of Certain Executory Contracts and Leases; (ii)(A) Authorizing the Sale of Substantially All of Debtor's Assets Pursuant to Successful Bidder(s)' Asset Purchase Agreement(s), Free and Clear of Liens, Claims, Encumbrances, and Other Interests; and (B) Approving Assumption and Assignment of Certain Executory Contracts and Leases; and (iii) Granting Related Relief.

"Bidding Procedures Order" means the order of the Bankruptcy Court, in the form attached as Schedule "A" and otherwise in form and substance acceptable to the Purchaser, approving, (i) the bidding procedures for conducting a sale and auction of the Purchased Assets and the assumption of the Assumed Liabilities; (ii) this Agreement as the Stalking Horse Bid in the bidding procedures, (iii) the Bid Protections; (iv) establishing a date with the Bankruptcy Court for an auction and hearing to consider approval of the Sale Order; (v) approving the form and manner of notice thereof; and (vi) approving procedures related to assumption and assignment of executory contracts and unexpired leases.

"Business Day" means any day other than a Saturday, a Sunday or any other day on which commercial banks in New York, New York or Toronto, Ontario are authorized or required by Law to close.

"Code" means the Internal Revenue Code of 1986.

"Competing Transaction" means a transaction, other than the Transaction, with one or more Persons, other than Purchaser, for the sale or disposition by the Debtor of all or substantially all of the Purchased Assets, that is a Successful Bid (as such terms are defined in the Bidding Procedures Order).

"Contract" means in respect of a Person, any contract, agreement, understanding, arrangement, commitment, promise or undertaking (including any indenture, note, bond or other evidence of indebtedness, instrument, license, lease, purchase order or other legally binding agreement), whether written or oral to which a Person is a party or by which the assets of such Person are affected.

"Cure Costs" means amounts that must be paid and obligations that otherwise must be satisfied under sections 365(b)(1)(A) and (B) of the Bankruptcy Code in connection with the assumption and assignment of any Purchased Contract, as determined by the Bankruptcy Court.

"Debtor Material Adverse Effect" means any event, change, effect, condition, state of facts or occurrence (regardless of whether such event, change, effect, condition, state of facts or occurrence constitutes a breach of any representation, warranty or covenant of the Debtor hereunder) which individually or in the aggregate has had or would reasonably be expected to have, when considered in the aggregate together with any other events, changes, effects, conditions, states of facts or occurrences, (i) a material adverse effect on or a material adverse change in or to the Business, the Purchased Assets, the results of operation, or the prospects of the Business, considered as a whole or (ii) a material and adverse effect on the ability of the Debtor to consummate the Transaction, in each case other than an event, change, effect, condition or occurrence resulting from an Excluded Matter.

"Excluded Matter" means any effect of: (i) any change in the United States or foreign economies or financial markets in general; (ii) any change that generally affects the industrial sectors in which the Debtor generally competes; (iii) any change arising in connection with earthquakes, hostilities, acts of war, sabotage or terrorism or military actions or any escalation or material worsening of any such hostilities, acts of war, sabotage or terrorism or military actions; (iv) any change in applicable Laws or accounting rules; (v) any actions taken by Purchaser or any of its affiliates; (vi) the public announcement of this Agreement; or (vii) the filing of the Bankruptcy Case and the Debtor's inability to pay certain obligations as a result of the filing of the Bankruptcy Case, provided that in the case of (i) through (iv) such event, change, effect, condition, state of facts or occurrence does not have a disproportionate effect on the Business or the Purchased Assets relative to other Persons operating in the same industry or with which the Debtor generally completes.

"Governmental Body" means any government or governmental or regulatory body thereof, or political subdivision thereof, or any agency, authority, department, commission, board, bureau, official or instrumentality of such body, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), whether foreign, federal, state, or local, or any agency, instrumentality or authority thereof, or any court or arbitrator thereof (public or private) of competent jurisdiction.

"IP Rights" means in respect of a Person, (a) all patents, patent applications, patent disclosures and inventions (whether or not patentable and whether or not reduced to practice), including all provisional applications, substitutions, continuations, patents of addition, improvement patents, divisions, renewals, reissues, confirmations, counterparts, re-examinations and extensions thereof, (b) all trademarks, service marks, trade dress, trade names, logos, domain names and corporate names, whether registered or existing at common law, (c) all registered and unregistered statutory and common law copyrights and industrial designs, (d) all registrations, applications, divisionals and renewals for any of the foregoing, (e) all trade secrets, confidential information, ideas, formulae, compositions, know-how, improvements, innovations, discoveries, designs, manufacturing and production processes and techniques, and (f) all other intellectual property rights, owned, licenced, controlled or used by such Person, in any and all relevant jurisdictions in the world.

"IRS" means the Internal Revenue Service.

"Law" means any federal, state, local or foreign law, statute, directive, code, ordinance, rule or regulation, binding interpretations or common law requirement of a Governmental Body.

"Lease" shall mean any lease for non-residential real property occupied by the Debtor identified on Schedule 2.1(b)(vi) (being the Union, N.J. Office/Plant lease and Black Buffalo Land Acquisition lease), together with all amendments, modifications, supplements, correspondence or notices concerning term commencement and expiration dates and other material matters affecting such lease and all non-disturbance agreements with fee owners or senior landlords, subordination, non-disturbance and attornment agreements, estoppels, waivers and consents in favor of the Debtor, estoppel certificates from landlords, and landlord waivers or other collateral access agreements in favor of the Debtor.

"Leased Real Property" means real property occupied by the Debtor pursuant to any Lease, including any security deposits related to such Leased Real Property.

"Legal Proceeding" means any judicial, administrative or arbitral actions, suits, investigations, proceedings (public or private) or claims (including cross-claim or counterclaim), demands, audits, causes of action, defaults, assessments, litigations, prosecutions, third party actions, complaints, allegations or any proceedings by any Person or by or before a Governmental Body.

"Liability" means any debt, loss, liability, claim (including "claim" as defined in the Bankruptcy Code), commitment, undertaking, damage, expense, fine, penalty, cost, royalty, deficiency or obligation (including those arising out of any action, such as any settlement or compromise thereof or judgment or award therein), of any nature, kind, description or character, whether known or unknown, disclosed or undisclosed, express or implied, primary or secondary, direct or indirect, matured or unmatured, vested or unvested, fixed, absolute, contingent, accrued or unaccrued, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, and whether due or to become due, executory, determined, determinable or otherwise, whether or not the same is required to be accrued on the financial statements of such Person and whether in contract, tort or otherwise.

"Lien" as applied to any Person means any lien, encumbrance, pledge, mortgage, deed of trust, security interest, claim, lease, charge, option, right of first refusal, right of retention, deemed trust, order imposing any of the rights of the type described in this definition, writ of seizure, writ of execution, notice of seizure, notice of execution, notice of sale, reservation of ownership, right of a third party (including any contractual rights such as purchase options, rights of first refusal, rights of first offer or any other pre-emptive contractual right), privilege, restriction or encumbrance or any other similar encumbrance of any nature or kind whatsoever that is or is capable of becoming any of the foregoing in respect of an asset of such Person, whether imposed by Law, Contract or otherwise.

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body.

"Ordinary Course of Business" means the ordinary and usual course of normal day-to-day operations of and in a manner consistent with the past practices of the Business.

"Party" or "Parties" means the Purchaser and the Debtor.

"Permitted Exceptions" means (i) statutory Liens for Taxes not yet due other than any such statutory Liens that may be discharged at Closing pursuant to the terms of the Sale Order, (ii) mechanics', carriers', workers', repairers' and similar Liens arising or incurred in the Ordinary Course of Business which have not been registered and for which sums are not yet delinquent or overdue, (iii) title of a lessor under a capital or operating lease if such lease is a Purchased Contract, (iv) any other imperfections in title, charges, easements, restrictions, licenses and encumbrances that do not materially affect the value or use of the affected Purchased Asset in the Business as currently conducted or transferability of the affected Purchased asset or property, and (v) Liens that will be released by the Sale Order.

"Person" means any individual, corporation, limited liability company, partnership, limited liability partnership. firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Body or other entity.

"Purchaser Material Adverse Effect" means any event, change, effect, condition, state of facts or occurrence (regardless of whether such event, change, effect, condition, state of facts or occurrence constitutes a breach of any representation, warranty or covenant of Purchaser hereunder) which has had or would reasonably be expected to have, individually or when considered together with any other event, change, effect, condition, state of facts or occurrence, a material and adverse effect on the ability of Purchaser to consummate the Transaction or perform its obligations under this Agreement.

"Representative" means, with respect to any Person, any and all directors, officers, partners, managers, employees, consultants, financial advisors, counsel, accountants and other agents, including potential financing sources of such Person.

"Sale Order" means the order of the Bankruptcy Court approving this Agreement and the Transaction contemplated hereby, in the form attached hereto as Schedule "B", and otherwise in form and substance satisfactory to Purchaser, acting reasonably, and vesting in the Purchaser (or Purchaser's assignee as it may direct) all the right, title and interest of the Company in and to the Purchased Assets.

"Tax Authority" means any Governmental Body, instrumentality or employee thereof, charged with the administration of any Law or regulation relating to Taxes.

"Taxes" means (i) all federal, state, local or foreign taxes, charges or other assessments, including all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property and estimated taxes, alternative or add-on minimum taxes, tariffs, customs duties or other taxes of any kind, whatsoever imposed or charged by any Tax Authority, (ii) any Liability for any item described in clause (i) for which a taxpayer is liable as a transferee or successor, by reason of Treasury Regulation Section 1.1502-6 or any similar provision of state, local, or foreign Law, or by contract, indemnity or otherwise, and (iii) all interest, penalties, fines, additions to tax or additional amounts imposed by any Tax Authority in connection with any item described in clause (i) or (ii).

"Tax Return" means all returns, declarations, reports, estimates, information returns and statements required to be filed in respect of any Taxes (including any attachments thereto or amendments thereof).

"Transaction Documents" means each other agreement, document or instrument contemplated by this Agreement or necessary to the consummation of the Transaction.

"Transaction" means the transactions contemplated by this Agreement.

1.2 Terms Defined Elsewhere in this Agreement. For purposes of this Agreement, the following terms have the meanings set forth in the sections indicated:

| Term | Section |
|---|---|
| Agreement | Preamble |
| Allocation Notice of Objection | 10.2(a) |
| Assumed Cure Costs | 2.5 |
| Assumed Liabilities | 2.3 |
| Back-Up Bidder | 7.5 |
| Bankruptcy Case | Recitals |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Bid Protections | 4.5(a)(ii) |
| Break Fee | 4.5(a)(i) |
| Business | Recitals |
| Cash Amount | 3.1(b) |
| Chapter 11 Deposits | 2.2(e) |
| Closing | 4.1 |
| Closing Date | 4.1 |
| Company | Preamble |
| Debtor | Preamble |
| DIP Term Sheet | 8.2(a) |
| Effective Date | Preamble |
| Excluded Assets | 2.2 |
| Excluded Liabilities | 2.4 |
| Final Allocation Statement | 10.2(a) |
| Inventory | 2.1(b)(ii) |
| Necessary Consent | 2.7(a) |
| Periodic Non-Income Taxes | 10.3(a) |
| Plans | 8.5(a) |
| Post-Closing Straddle Period | 10.3(b) |
| Pre-Closing Straddle Period | 10.3(b) |
| Proposed Allocation Statement | 10.2(a) |
| Purchased Assets | 2.1(b) |
| Purchased Contracts | 2.1(b)(vi) |
| Purchased Intellectual Property | 2.1(b)(iii) |
| Purchase Price | 3.1 |
| Purchaser | Preamble |
| Straddle Period | 10.3(b) |
| Successful Bidder | 7.5 |
| Tangible Personal Property | 2.1(b)(i) |
| Termination Date | 4.4(a) |
| Transfer Taxes | 10.1 |
| Transferred Employees | 8.5(a) |

1.3 Other Definitional and Interpretive Matters. (a) Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation will apply:

Calculation of Time Period. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date

that is the reference date in calculating such period will be excluded. If the last day for the giving of any notice or the performance of any act required or permitted under this Agreement is a day that is not a Business Day, then the time for the giving of such notice or the performance of such action will be extended to the next succeeding Business Day.

Conjunctive. The word "or" is used in the inclusive sense of "and/or."

Contracts. Reference to any Contract means such Contract as amended or modified and in effect from time to time in accordance with its terms and includes all exhibits, schedules and other attachments thereto.

Dollars. Any reference in this Agreement to $ will mean U.S. dollars.

Exhibits/Schedules. All Exhibits and Schedules annexed hereto or referred to herein are incorporated in, and made a part of, this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein will be defined as set forth in this Agreement.

Gender and Number. Any reference in this Agreement to gender will include all genders, and words imparting the singular number only will include the plural and vice versa.

Headings. The division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and will not affect or be utilized in construing or interpreting this Agreement. All references in this Agreement to any Article, Section, Recital, Exhibit or Schedule are to the corresponding Article, Section, Recital, Exhibit or Schedule of or to this Agreement unless otherwise specified.

Herein. The words such as "herein," "hereinafter," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

Including. The word "including" or any variation thereof means "including, without limitation" and will not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

Law. Reference to any Law means such Law as amended, modified, codified, replaced or re-enacted, in whole or in part, and in effect from time to time, including any successor legislation thereto and any rules and regulations promulgated thereunder, and references to any section or other provision of a Law means that section or provision of such Law in effect from time to time and constituting the substantive amendment, modification, codification, replacement or re-enactment of such section or other provision.

Mutual Preparation. The Parties have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as jointly drafted by the Parties and no presumption or burden of proof will arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

Language. This Agreement and each Transaction Document has been drafted, negotiated and executed in the English language. If this Agreement or any Transaction Document is translated into another language, the English text will govern and control for all purposes.

## II. PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

2.1 Purchase and Sale of Assets.

(a) On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser will purchase, acquire and accept from the Debtor, and the Debtor will sell, transfer, convey and deliver to Purchaser, all of the Debtor's right, title and interest in, to and under the Purchased Assets, free and clear of all Liens (other than those Liens created by Purchaser and Permitted Exceptions) and Excluded Liabilities.

(b) The term "Purchased Assets" means all of the properties, assets and rights of the Debtor (other than the Excluded Assets) existing as of the Closing, including the following:

(i) all equipment, machinery, forklifts, vehicles, fixtures, furniture, furnishings, computer hardware, 3D printing machines, replacement parts, and other tangible personal property owned by the Debtor whether or not located on or at the Leased Real Property and whether or not used or held for use in the Business, as set forth on Schedule 2.1(b)(i) (collectively, the "Tangible Personal Property");

(ii) all inventory, including 3D printing machines, replacement parts, cement-based ink and materials for making such ink, supplies and packaging materials that, as of the close of business on the Closing Date, is used or held for use in the Business whether or not located at the Leased Real Property (the "Inventory");

(iii) all trademarks, patents, copyrights and domain names and other IP Rights of the Debtor, including those listed on Schedule 2.1(b)(iii), and all rights of action and remedies for past, present and future infringements of any of the foregoing (the "Purchased Intellectual Property");

(iv) all of the Debtor's equity interest in and amounts owing to the Debtor by (A) HISYS Co., Ltd., a company existing under the laws of the Republic of Korea, (B) any other subsidiary of the Debtor identified by the Purchaser prior to Closing;

(v) all avoidance actions or similar causes of action arising under sections 544 through 553 of the Bankruptcy Code, including any proceeds thereof;

(vi) all of the Contracts to which the Debtor is a party (A) including those that are set forth on Schedule 2.1(b)(vi), (B) that are unexpired as of the Closing Date (including those Contracts that have been previously unrenewed) and (C) that have not been rejected (or are the subject of a notice of rejection or a pending rejection motion) by the Debtor at the express written direction of the Purchaser prior to Closing (the "Purchased Contracts");

(vii) all accounts receivable, including but not limited to collection of any judgments in favor of the Debtor, a list of which is set out in Schedule 2.1(b)(vii) as of the date of

this Agreement, and without limiting the foregoing, all cash payments received following the date of this Agreement and all securities in and rights to any amounts owing to the Debtor or any of its subsidiaries by Alquist 3D LLC, including in respect of the convertible promissory note financing with Alquist 3D LLC, any preferred units issued thereunder, any claim or judgment against Alquist 3D LLC, including the decision and order of the Supreme Court of the State of New York County of Nassau – Commercial Division Part 7 dated April 28, 2025 and entered May 5, 2025, whether or not relating to such financing or preferred units, and all proceeds therefrom received by the Debtor following the date of this Agreement;

(viii) the leasehold interest of the Debtor in and to the Leased Real Property together with the Debtor's interest in all fixtures and leasehold improvements located at the Leased Real Property and, for the avoidance of doubt, the security deposit(s) under the Leases in respect of such Leased Real Property;

(ix) all books and all books of account, financial records and statements, personnel records of Transferred Employees, historic documents relating to the Purchased Assets, sales and purchase records, cost and pricing information, customer and supplier files, research and development records, production records, equipment logs and all other documents, files, correspondence and other information of the Debtor relating to the Business or the Purchased Assets;

(x) all claims of the Debtor relating to the Business or the Purchased Assets, whether choate or inchoate, known or unknown, contingent or otherwise, including under warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent related to the Purchased Assets;

(xi) all prepaid expenses and deposits relating to the Business or the Purchased Assets, including post-petition adequate assurance deposits provided to utilities and any deposits provided to suppliers or service providers to the Debtor on a prepetition or post-petition basis (collectively, the "Chapter 11 Deposits") except to the extent solely relating to an Excluded Asset or Excluded Liability;

(xii) to the extent assignable under applicable Law, all consents and authorizations, permits and licenses of any Governmental Body, or pursuant to Section 2.7 by an order of the Bankruptcy Court which has been granted, pertaining to the Business or the Purchased Assets; and

(xiii) the goodwill of the Business, including the right of the Purchaser to (i) represent itself as carrying on the Business in continuation of the Debtor, and (ii) use any words indicating that the Business is so carried on, including all of the Debtor's rights in the name "Black Buffalo 3D" or any variation of it, together with the rights, if any, in telephone and facsimile numbers, e-mail addresses and internet domain names used in connection with the Business.

2.2 Excluded Assets. Nothing herein will be deemed to constitute an agreement to sell, transfer, assign or convey the Excluded Assets to Purchaser, and the Debtor will retain all right, title and interest to, in and under the Excluded Assets. The term "Excluded Assets" means the following assets, properties and rights of the Debtor:

(a) all cash and cash equivalents and any cash collateral posted in respect of bonds and permits (excluding prepaid expenses and deposits relating to the Business and any cash collateral posted in respect of Purchased Assets and any amounts received in respect of or proceeds from any Purchased Assets following the date of this Agreement);

(b) rights, claims, causes of action and credits to the extent exclusively relating to any Excluded Asset or Excluded Liability, including any such item to the extent arising under any guarantee, warranty, indemnity or similar right in favor of a Debtor solely in respect of an Excluded Asset or Excluded Liability;

(c) any shares of capital stock or other equity interest in the Debtor and any of its subsidiaries or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interest of the Debtor, other than (i) the Debtor's shares in HISYS Co., Ltd. and (ii) any shares of capital stock or other equity held by the Debtor including in any subsidiary of the Debtor to the extent identified by the Purchaser as a Purchase Asset prior to Closing;

(d) any minute books, stock ledgers, corporate seals and stock certificates of the Debtor, and other similar books and records that the Debtor is required by Law to retain, including Tax Returns and financial statements, except that the Debtor will provide copies of all or any portions of such retained books and records requested by the Purchaser;

(e) all post-petition adequate assurance deposits provided to utilities and any deposits provided to suppliers or service providers to the Debtor on a prepetition or post-petition basis (collectively, the "Chapter 11 Deposits") solely to the extent relating to an Excluded Asset or Excluded Liability;

(f) subject to Section 2.6, any Purchased Contract that requires a consent of a third party to be assumed and assigned hereunder as to which, by the Closing Date, such consent has not been obtained and for which the Bankruptcy Court has not entered an order approving such assumption and assignment notwithstanding the lack of third party consent;

(g) refunds, credits and rebates of Taxes for any period or portion thereof ending on or before the Closing Date; and

(h) all rights in or to assets leased by the Debtor except to the extent the Liabilities under the associated lease are assumed by Purchaser and such lease is assigned to Purchaser as a Purchased Contract; and

(i) all rights of the Debtor under this Agreement or the other Transaction Documents; and

(j) any other assets, properties or rights expressly excluded by the Purchaser by notice to the Debtor delivered prior to Closing and referencing this Section 2.2(j).

2.3 Assumption of Liabilities. On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser will assume, effective as of the Closing, and will timely perform and discharge in accordance with their respective terms, the following Liabilities (collectively, the "Assumed Liabilities"):

(a) all Liabilities arising, except as set forth below, on or after the Closing from the ownership or operation on or after Closing of the Purchased Assets by Purchaser;

(b) all Liabilities of the Debtor under the Purchased Contracts that arise on or after the Closing Date, and not relating to any default existing prior to, or as a consequence of, Closing;

(c) any Assumed Cure Costs that Purchaser is required to pay pursuant to Section 2.5;

(d) all Liabilities of the Debtor under or associated with any permit, license, approval, certification, order or other right granted by any Governmental Body included in the Purchased Assets arising or relating to the period following Closing and not relating to any default existing prior to, or as a consequence of, Closing; and

(e) all Liabilities listed on Schedule 2.3(g).

2.4 Excluded Liabilities. Notwithstanding anything to the contrary set forth herein, Purchaser will not assume and will be deemed not to have assumed any of the Excluded Liabilities. "Excluded Liabilities" means any and all Liabilities of the Debtor or any of its affiliates arising out of, relating to or otherwise in respect of the Business, the Purchased Assets or the Excluded Assets arising prior to the Closing other than the Assumed Liabilities. Without limiting the foregoing, Excluded Liabilities include: (a) all indebtedness of the Debtor and its affiliates; (b) all Liabilities arising out of Contracts that are not Purchased Contracts; (c) all accounts payable and trade payables of Debtor, including intercompany payables; (d) all fees or commissions of any brokers, funds or investment banks in connection with the transactions contemplated by this Agreement and the other Transaction Documents; (e) any Cure Amounts payable by the Debtor that are not Assumed Cure Costs; (f) all Liabilities for, or related to any obligation for, any Taxes that are not expressly assumed by the Purchaser (including any and all Taxes of or imposed on the Debtor or any of its affiliates and any all Taxes imposed with respect to the ownership or operation of the Business, the Purchased Assets or the Assumed Liabilities for any period or portion thereof ending on or before the Closing Date); (g) all Liabilities for, or related to any obligation for, any Transfer Taxes; (h) Liabilities relating to employees or the Debtor and Plans (except as provided in Section 8.5 in respect of Transferred Employees); and (i) all Liabilities of the Debtor arising under this Agreement and the Transaction Documents.

2.5 Cure Amounts. At the Closing and pursuant to section 365 of the Bankruptcy Code, the Debtor will assume the Purchased Contracts (to the extent not previously assumed) and, subject to the terms herein, assign the Purchased Contracts to Purchaser, and Purchaser, subject to the terms herein, will assume the Purchased Contracts. All Cure Costs with respect to the Purchased Contracts (the "Assumed Cure Costs") will be paid by the Purchaser, as and when finally determined by the Bankruptcy Court pursuant to the procedures set forth in the Sale Order or other order of the Bankruptcy Court, and not by the Debtor, and the Debtor will have no liability for any Assumed Cure Costs.

2.6 Rejection of Contracts. From the date hereof until the Closing Date, the Debtor shall not seek approval from the Bankruptcy Court to reject any Purchased Contract unless and

until such Purchased Contract is designated by the Buyer as an Excluded Asset or unless otherwise agreed to in writing by the Purchaser. The Purchaser may designate any Contract as a Purchased Contract or Excluded Asset or change any designation as a Purchased Contract previously made to an Excluded Asset by delivering written notice to the Debtor not less than seven (7) days prior to the Closing Date. Immediately following the Closing Date, the Debtor may move to reject any Contract that is not a Purchased Contract.

2.7 Non-Assignment of Assets.

(a) Notwithstanding any other provision of this Agreement to the contrary, this Agreement will not constitute an agreement to assign or transfer and will not effect the assignment or transfer of any Purchased Asset if (i) an attempted assignment or transfer thereof, without the approval, authorization or consent of, or granting or issuance of any license or permit by, any third party thereto (each such action, a "Necessary Consent"), would constitute a breach, default or violation thereof or of any Law or Order or in any way adversely affect the rights of Purchaser thereunder if such Necessary Consent has not been obtained by the Closing, and (ii) the Bankruptcy Court has not entered an order approving such assignment or transfer; provided that where directed by the Purchaser, the Debtor shall use its best efforts to have the Bankruptcy Court enter an order approving such assignment or transfer notwithstanding that such Necessary Consent has not been obtained. In such event, such assignment or transfer is subject to such Necessary Consent being obtained and the Debtor and Purchaser will, following entry of the Sale Order, use their commercially reasonable efforts to obtain the Necessary Consents with respect to any such Purchased Asset or any claim or right or any benefit arising thereunder for the assignment or transfer thereof to Purchaser as Purchaser may reasonably request; provided that the Debtor will not be obligated to pay any consideration therefor to any third party from whom consent or approval is requested (other than Assumed Cure Costs, which shall be payable by the Purchaser) or to initiate any litigation or Legal Proceedings to obtain any such consent or approval. If such Necessary Consent is not obtained, or if an attempted assignment or transfer thereof would be ineffective or would adversely affect the rights of Purchaser to such Purchased Asset following the Closing, the Debtor will cooperate with any reasonable request of the Purchaser to enter into an arrangement at no material expense to the Debtor, under which Purchaser would obtain the benefits and assume the obligations thereunder in accordance with this Agreement.

(b) Subject to Section 2.7(a), if after the Closing (i) Purchaser holds any Excluded Assets or Excluded Liabilities or (ii) the Debtor holds any Purchased Assets or Assumed Liabilities, Purchaser or the Debtor, as applicable, will promptly transfer (or cause to be transferred) such assets or assume (or cause to be assumed) such Liabilities to or from (as the case may be) the other Party. Prior to any such transfer, the Party receiving or possessing any such asset will hold it in trust for the other Party.

(c) Notwithstanding anything herein to the contrary, at any time prior to the date that is the later of (i) five days after the resolution of any dispute with a non-debtor party to a Purchased Contract relating to the Cure Amount or adequate assurance and (ii) the conclusion of the cure objection hearing relating to any particular Purchased Contract as to which a cure objection has been timely filed, Purchaser will be entitled, in its sole discretion, to remove any Contract from Schedule 2.1(b)(vi) by providing written notice thereof to the Debtor and any Contract so removed will be deemed to be an "Excluded Asset" and not a Purchased Contract for

all purposes hereunder. The Debtor will not reject or seek to reject any Contract that is a Purchased Contract without the consent of Purchaser.

2.8 Further Conveyances and Assumptions. From time to time following the Closing, the Debtor and Purchaser will, at the expense and request of the other, execute, acknowledge and deliver all such further conveyances, notices, assumptions, assignments, releases and other instruments, and will take such further actions, as may be reasonably necessary or appropriate to assure fully to Purchaser and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Purchaser under this Agreement and to assure fully to the Debtor, the assumption of the liabilities and obligations intended to be assumed by Purchaser under this Agreement, and to otherwise make effective the Transaction, except that nothing in this Section 2.8 will require Purchaser to assume any Liabilities other than the Assumed Liabilities.

## III. CONSIDERATION; ADJUSTMENT

3.1 Consideration. The aggregate consideration for the Purchased Assets (the "Purchase Price") will be the sum of:

(a) One Million Five-Hundred Thousand Dollars ($1,500,000.00) representing One Million Five-Hundred Thousand Dollars ($1,500,000.00) of the DIP Financing (as defined in the Bidding Procedures Motion) (the "Credit Bid");

(b) the Assumed Cure Costs (the "Cash Amount"); and

(c) the assumption of the Assumed Liabilities.

3.2 Payment of Purchase Price. On the Closing Date, (a) Purchaser will pay to the Debtor, by wire transfer of immediately available funds to the account or accounts designated by the Debtor, the Cash Amount, and (b) the Credit Bid shall be accepted by the Debtor in full and final satisfaction and release of the Purchaser's secured debt; and (c) the Debtor shall assign to the Purchaser and the Purchaser shall accept and assume the Assumed Liabilities.

3.3 Apportionments.

(a) To the extent the following ordinary course costs and expenses (and credits therefor to the extent paid prior to the Closing Date) of the Business relate to a Purchased Contracts or to Leased Real Property for a period that begins prior to the Closing Date and ends after the Closing Date, such expenses (and credits) are to be apportioned between the Debtor, on the one hand, and Purchaser, on the other hand, as of 11:59 P.M. local time on the Closing Date:

(i) annual utility assessments, water meter charges, and sewer rents, if any, on the basis of the year for which assessed; and

(ii) charges and fees payable for telephone services, water, heat, steam, electric power, gas and other utilities, at the price charged by the suppliers, including any Taxes thereon and based upon applicable meter readings, where available, made on or immediately prior to or immediately after the Closing Date.

(b) If, after apportioning the foregoing expenses, a Party has borne more than its allocable share of such expenses, the other Party will promptly make the appropriate compensating payment(s) to such Party.

3.4 Withholding. Purchaser and its affiliates shall be entitled to deduct and withhold from any amount otherwise payable to the Debtor pursuant to this Agreement such amounts as it is required to deduct and withhold with respect to the making of such payment under any provision of federal, state, local or foreign Law related to this Agreement. If any amount is so withheld and timely paid to the appropriate Governmental Body, such withheld amounts shall be treated for all purposes of the Agreement as having been paid to the Debtor.

## IV. CLOSING AND TERMINATION

4.1 Closing Date. Subject to the satisfaction of the conditions set forth in Sections 9.1, 9.2 and 9.3 (or the waiver thereof by the Party entitled to waive that condition), the closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities provided for in Article II (the "Closing") will take place at Ballard Spahr LLP, 222 Delaware Avenue, 10th Floor, Wilmington, Delaware 19801 at 9:00 a.m. (Eastern time) on the date that is fourteen (14) days following the satisfaction or waiver of the conditions set forth in Article IX (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), or at such other place and time as the Parties may designate in writing. The date on which the Closing is held is referred to in this Agreement as the "Closing Date."

4.2 Deliveries by the Debtor. At the Closing, the Debtor will deliver to Purchaser:

(a) one or more duly executed bills of sale effecting the transfer of the Purchased Assets in a form prepared by the Purchaser and reasonably acceptable to Debtor;

(b) one or more duly executed IP Rights assignments in a registrable form effecting the transfer of the IP Rights included in the Purchased Assets prepared by the Purchaser and reasonably acceptable to Debtor;

(c) one or more duly executed assumption and assignment agreements in a form effecting the assignment and assumption of the Assumed Liabilities prepared by the Purchaser and reasonably acceptable to Debtor;

(d) all other deeds, endorsements, assignments and other instruments of conveyance and transfer, reasonably requested by Purchaser, to convey and assign the Purchased Assets to Purchaser and vest title therein in Purchaser;

(e) an IRS Form W-9 duly completed and executed by the Debtor; and

(f) the officers certificate required to be delivered pursuant to Sections 9.1(a) and 9.1(b).

4.3 Deliveries by Purchaser. At the Closing, Purchaser will deliver to the Debtor:

(a) the consideration specified in Section 3.1;

(b) one or more duly executed assumption and assignment agreements in a form to be agreed upon by the Parties;

(c) the officers certificate required to be delivered pursuant to Sections 9.2(a) and 9.2(b); and

(d) all such other documents, instruments and certificates, reasonably requested by the Debtor, to evidence the assumption by Purchaser of the Assumed Liabilities.

4.4 Termination of Agreement. This Agreement may be terminated prior to the Closing as follows:

(a) by Purchaser or the Debtor, if the Closing has not occurred by 5:00 p.m. Eastern time on June 30, 2026 (the "Termination Date"), provided that if the Closing has not occurred on or before the Termination Date due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement by Purchaser or the Debtor, then the breaching Party may not terminate this Agreement pursuant to this Section 4.4(a);

(b) by mutual written consent of the Debtor and Purchaser;

(c) by Purchaser, if the Debtor breaches any representation or warranty or any covenant or agreement contained in this Agreement, such breach would result in a failure of a condition set forth in Sections 9.1 or 9.3 and such breach has not been cured by the earlier of (i) ten Business Days after the giving of written notice by Purchaser to the Debtor of such breach and (ii) the Termination Date; provided that Purchaser shall not have the right to terminate this Agreement pursuant to this Section 4.4(c) if Purchaser is then in material breach of any representation, warranty, covenant or agreement contained in this Agreement that would result in the closing conditions set forth in Section 9.2(a) or 9.2(b) not being satisfied;

(d) by the Debtor, if Purchaser breaches any representation or warranty or any covenant or agreement contained in this Agreement, such breach would result in a failure of a condition set forth in Sections 9.2 or 9.3 and such breach has not been cured by the earlier of (i) ten Business Days after the giving of written notice by the Debtor to Purchaser of such breach and (ii) the Termination Date; provided that the Debtor shall not have the right to terminate this Agreement pursuant to this Section 4.4(d) if the Debtor is then in material breach of any representation, warranty, covenant or agreement contained in this Agreement that would result in the closing conditions set forth in Section 9.1(a) or 9.1(b) not being satisfied;

(e) by the Debtor or Purchaser upon written notice upon the earlier of (i) the Bankruptcy Court's entry of an order approving a Successful Bid with a Successful Bidder (other than the Purchaser) and a Backup Bidder (as defined in the Bidding Procedures Motion) other than the Purchaser; (ii) thirty (30) days after the Bankruptcy Court's entry of an order approving a Successful Bid with a Successful Bidder (other than the Purchaser) and the Purchaser as a Backup Bidder (as defined in the Bidding Procedures Motion), and (iii) the closing of a Transaction to a Successful Bidder (other than the Purchaser).

(f) by the Purchaser on notice to the Debtor if the Debtor withdraws or seeks authority to withdraw the motion in respect of the Bidding Procedures Order; and

(g) by the Debtor or Purchaser if there is in effect a final non-appealable order of a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Transaction; it being agreed that solely if required by the Purchaser, the Parties will promptly appeal any adverse determination which is not non-appealable and pursue such appeal with reasonable diligence unless and until this Agreement is terminated pursuant to this Section 4.4.

4.5 Procedure Upon Termination.

(a) In the event of termination pursuant to Section 4.4(e), the terminating Party will give written notice thereof to the other Party and the Debtor shall pay Purchaser within two (2) Business Days following the Closing of a Transaction to a Successful Bidder other than the Purchaser in immediately available funds by wire transfer to the account designed for such purpose by the Purchaser:

(i) a break-up fee equal to three percent (3%) of the Purchase Price (the "Break Fee"); and

(ii) an expense reimbursement for the Purchaser's legal and other costs incurred in connection with this Agreement in an aggregate amount not to exceed $150,000 plus applicable taxes (together with the Break Fee, the "Bid Protections"),

and this Agreement will terminate as described in Section 4.6, and the purchase of the Purchased Assets hereunder will be abandoned, without further action by Purchaser or the Debtor; provided that no Bid Protections will be payable in respect of a termination pursuant to Section 4.4(d), (b), (c), (d), (f), or (g). The Parties acknowledge and agree that the Bid Protections represent a fair and reasonable estimate of the expenses costs and damages that will be incurred by the Purchaser as a result of preparing and entering into, and not completing the Transactions contemplated by this Agreement, and is not intended to be punitive in nature nor to discourage competitive bidding for the Purchased Assets. For certainty, the Bid Protections do not form part of the Purchase Price.

4.6 Effect of Termination. In the event that this Agreement is terminated as provided herein, then except for the obligation to pay the Bid Protections, each of the Parties will be relieved of its duties and obligations arising under this Agreement after the date of such termination, and the Parties and their respective Representatives will be fully released and discharged from any Liability after such termination, and such termination shall be without liability to any Party, except that the provisions of Section 4.5, this Section 4.6, and Article XI and, to the extent necessary to effectuate the foregoing enumerated provisions, Section 1.1, Section 1.2 and Section 1.3, will survive any such termination and will be enforceable.

## V. REPRESENTATIONS AND WARRANTIES OF THE DEBTOR

The Debtor hereby represents and warrants to Purchaser that:

5.1 Incorporation, Status and Authorization of Agreement. The Debtor is a corporation incorporated and existing under the laws of Delaware, and is in good standing under its laws of incorporation. Subject to entry of the Sale Order and such other authorization as is required by the Bankruptcy Court: (a) the Debtor has the requisite power and authority to execute and deliver this

Agreement and the Transaction Documents to which he is a party and to perform his obligations hereunder and thereunder; (b) this Agreement and the Transaction Documents to which the Debtor is a party have been duly and validly executed and delivered, and each agreement, document or instrument contemplated hereby or thereby to be delivered at or prior to Closing will be duly and validly executed and delivered, by the Debtor; and (c) (assuming the due authorization, execution and delivery by the Purchaser) this Agreement and the Transaction Documents to which the Debtor is a party constitute legal, valid and binding obligations of the Debtor enforceable against the Debtor in accordance with its terms.

5.2 Conflicts; Consents of Third Parties.

(a) Subject to entry of the Sale Order, the execution and delivery by the Debtor of this Agreement and the Transaction Documents to which it is a party, the consummation of the Transaction and compliance by the Debtor with any of the provisions hereof or thereof do not and will not (or would and will not with the giving of notice, the lapse of time, or both, or the happening of any other event or condition) result in or give rise to a breach or a violation of or allow any other Person to exercise any right of termination, cancellation or acceleration of any obligation or to loss of a material benefit under, or result in the creation of any Liens upon any of the Purchased Assets or cancellation under any provision of, as applicable, (i) the certificate of incorporation and by-laws or comparable organizational documents of the Debtor, (ii) any Purchased Contract or other Contract by which the Debtor is bound or the assets of the Debtor are affected, (iii) IP Rights, (iv) any Order, or (v) any applicable Law.

(b) Subject to entry of the Sale Order, no consent, waiver, approval, Order or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required in connection with the execution and delivery by the Debtor of this Agreement or any other agreement, document or instrument contemplated hereby or thereby to which the Debtor is a party, the compliance by the Debtor with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by the Debtor of any other action contemplated hereby or thereby (with or without notice or lapse of time, or both), except for the entry of the Sale Order.

5.3 Reserved.

5.4 Title to Purchased Assets. Subject to the entry of the Sale Order, at the Closing, Purchaser will be vested with good and valid title to the Purchased Assets, free and clear of all Liens (other than Permitted Exceptions) and Excluded Liabilities, to the fullest extent permissible under Law.

5.5 Proceedings. There are no Claims pending against the Company or, to the knowledge of the Company, threatened, with respect to, or in any manner affecting, title to the Purchased Assets or the Business, or that would reasonably be expected to enjoin, delay, restrict or prohibit the Transaction or which would reasonably be expected to delay, restrict or prevent the Company from fulfilling any of its obligations set forth in this Agreement, and no event has occurred or circumstance exists which would reasonably be expected to give rise to or serve as a valid basis for the commencement of any such proceeding.

5.6 No Other Agreement to Purchase. Except for the Purchaser's rights under this Agreement, no Person has any contractual right, option or privilege for the purchase or acquisition from the Company of any of the Purchased Assets.

5.7 Reserved. Financial Advisors. The Debtor has not incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement or the Transaction for which Purchaser is or will become liable.

5.9 No Other Representations or Warranties; Schedules. Except for the representations and warranties contained in this Article V (as modified by the Schedules), none of the Debtor nor any other Person makes any other express or implied representation or warranty with respect to the Debtor, the Purchased Assets, the Assumed Liabilities or the Transaction, and the Debtor disclaims any other representations or warranties, whether made by the Debtor, any Affiliate of the Debtor, or any Representative of any of the foregoing. Except for the representations and warranties contained in this Article V (as modified by the Schedules), the Debtor (a) expressly disclaims and negates any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Purchased Assets (including any implied or expressed warranty of merchantability or fitness for a particular purpose, or of conformity to models or samples of materials) and (b) disclaims all liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Purchaser or its affiliates or Representatives pursuant to Section 8.1 or otherwise (including any opinion, information, projection, or advice that may have been or may be provided to Purchaser by any Representative of the Debtor). The Debtor makes no representations or warranties to Purchaser regarding the probable success or profitability of the Purchased Assets or the use thereof. The disclosure of any matter or item in any Schedule will not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material or that such matter could result in a Debtor Material Adverse Effect. Purchaser releases and waives all claims arising from or related to any representation or warranty allegedly made by the Debtor or any other Person relating to the Transaction with respect to the Debtor, the Purchased Assets, the Assumed Liabilities or the Transaction, not contained in this Agreement.

## VI. REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to the Debtor that:

6.1 Organization and Good Standing. Purchaser is an entity duly organized, validly existing and in good standing under the laws of the state of its organization.

6.2 Authorization of Agreement. Purchaser has the requisite power and authority to execute and deliver this Agreement and the Transaction Documents to which it is a party and to perform its obligations hereunder and thereunder. The execution and delivery of this Agreement and the Transaction Documents to which Purchaser is a party and the consummation of the Transaction and the transactions contemplated by the Transaction Documents have been duly authorized by all requisite corporate or similar action on the part of Purchaser. This Agreement and the Transaction Documents to which Purchaser is a party have been duly and validly executed and delivered, and each agreement, document or instrument contemplated hereby or thereby to be

delivered at or prior to the Closing will be duly executed and delivered by Purchaser and (assuming the due authorization, execution and delivery by the other Parties) this Agreement and the Transaction Documents to which Purchaser is a party constitutes legal, valid and binding obligations of Purchaser enforceable against it in accordance with its respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

6.3 Conflicts; Consents of Third Parties.

(a) The execution and delivery by Purchaser of this Agreement and the Transaction Documents to which Purchaser is a party, the consummation of the Transaction, and compliance by Purchaser with any of the provisions hereof or thereof do not conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancellation, or acceleration of any obligation or to loss of a material benefit under, any provision of (i) the certificate of incorporation and by-laws or comparable organizational documents of Purchaser, (ii) any Contract to which Purchaser is a party or by which any of the properties or assets of Purchaser are bound, (iii) any Order, or (iv) any applicable Law, other than, in the case of clauses (ii), (iii) and (iv), such conflicts, violations, defaults, terminations or cancellations that would not reasonably be expected to have, individually or in the aggregate, a Purchaser Material Adverse Effect.

(b) Subject to entry of the Sale Order, no consent, waiver, approval, Order or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required in connection with the execution and delivery by Purchaser of this Agreement and the Transaction Documents to which Purchaser is a party, the compliance by Purchaser with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby, the taking by Purchaser of any other action contemplated hereby or thereby, except for (i) the entry of the Sale Order, and (ii) immaterial consents, waivers, approvals, Orders, authorizations, declarations, filings and notifications.

6.4 Financial Advisors. No Person has acted, directly or indirectly, as a broker, finder or financial advisor for Purchaser in connection with the Transaction and no Person is entitled to any fee or commission or like payment in respect thereof.

6.5 Financial Capability. Purchaser has sufficient funds and other financial wherewithal or commitments to: (a) pay in cash the Purchase Price and the fees and expenses required to be paid by Purchaser in connection with the Transaction and to effect the Transaction; (b) credit bid the Credit Bid portion of the Purchase Price as required to be paid by Purchaser in connection with the Transaction; and (c) to pay any Cure Costs associated with, and to perform under, the Purchased Contracts. Upon the consummation of the Transaction (i) Purchaser will not be insolvent as defined in Section 101 of the Bankruptcy Code, (ii) Purchaser will not be left with unreasonably small capital, (iii) Purchaser will not have incurred debts beyond its ability to pay such debts as they mature; and (iv) the capital of the Purchaser will not be impaired.

6.6 Condition of the Purchased Assets. Notwithstanding anything contained in this Agreement to the contrary, Purchaser acknowledges and agrees that the Debtor is not making any representations or warranties whatsoever, express or implied, beyond those expressly given by the Debtor in Article V (as modified by the Schedules), and Purchaser acknowledges and agrees that, except for the representations and warranties contained therein, the Purchased Assets are being transferred on a "where is" and, as to condition, "as is" basis.

## VII. BANKRUPTCY COURT MATTERS

7.1 Bankruptcy Court Filings. The Debtor will pursue diligently the entry of the Sale Order. Purchaser agrees that it will promptly take such actions as are reasonably requested by the Debtor to assist in obtaining entry of the Sale Order as it relates to the Transaction and a finding of adequate assurance of future performance by Purchaser of the Purchased Contracts, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purpose, among others, of providing necessary assurances of performance by Purchaser under this Agreement. The Debtor will give Purchaser reasonable advance notice of any hearings regarding the motions required to obtain the issuance of the Sale Order and Purchaser will have the right to attend and seek to be heard at any such hearings.

7.2 Bankruptcy Process. Unless the Purchaser is in material breach of this Agreement or this Agreement has been terminated, the Debtor covenants and agrees that if the Sale Order is entered, the terms of any plan submitted by the Debtor to the Bankruptcy Court for confirmation or otherwise supported by the Debtor shall not conflict with, supersede, abrogate, nullify, or restrict the terms of this Agreement or the rights of the Purchaser hereunder, or prevent or materially interfere with the consummation or performance of the transactions contemplated by this Agreement, including any transaction that is contemplated by or approved pursuant to the Sale Order. If the Sale Order or any other Order of the Bankruptcy Court relating to this Agreement shall be appealed or any petition for certiorari or motion for rehearing or re-argument shall be filed with respect thereto, the Debtor agrees to take all action as may be commercially reasonable and appropriate to defend against such appeal, petition or motion, and the Purchaser agrees to cooperate in such efforts, and each Party agrees to use its reasonable efforts to obtain an expedited resolution of such appeal.

7.3 Approval. The Debtor's obligations under this Agreement and in connection with the transactions contemplated by this Agreement are subject to entry of and, to the extent entered, the terms of any Orders of the Bankruptcy Court (including entry of the Sale Order). Stalking Horse Bidder. The Debtor has selected the Purchaser to serve as the Stalking Horse Bidder subject to higher or better competing bids in respect of the Purchased Assets in accordance with the terms of the Bidding Procedures Order. Auction. This Agreement and the sale of the Purchased Assets are subject to higher and better bids and approval by the Bankruptcy Court. The Purchaser acknowledges that the Debtor must take reasonable steps to demonstrate that it has sought to obtain the highest or otherwise best price for the Purchased Assets, including giving notice to the creditors of the Debtor and other interested parties, providing information about the Debtor to prospective bidders, entertaining higher and better offers from such prospective bidders, and, in the event that additional qualified prospective bidders desire to bid for the Purchased Assets, conducting an Auction. If an Auction is conducted, and the Purchaser is not the prevailing party at the conclusion of such Auction (such prevailing party, the "Successful Bidder") but is the next highest bidder at

the Auction, the Purchaser shall be required to serve as a back-up bidder (the "Back-Up Bidder") and keep the Purchaser 's bid to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be revised in the Auction) in accordance with the Bidding Procedures Order. If the Successful Bidder fails to consummate the applicable Competing Transaction as a result of a breach or failure to perform on the part of such Successful Bidder, the Back-Up Bidder will be deemed to have the new prevailing bid, and the Debtor may consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may have been improved upon in the Auction).

**COVENANTS**

8.1 Access to Information. From the Effective Date through the Closing Date, Purchaser will be entitled, through its Representatives, to make such investigation of the Business, Purchased Assets and the Assumed Liabilities as it reasonably requests. Any such investigation and examination will be conducted upon reasonable advance notice during normal business hours and under reasonable circumstances and will be subject to restrictions under applicable Law. The Debtor will use commercially reasonable efforts to reasonably cooperate with Purchaser and Purchaser's Representatives in connection with such investigation and examination, and Purchaser and its Representatives will reasonably cooperate with the Debtor. Notwithstanding anything herein to the contrary, no such investigation or examination will be permitted to the extent that it would require the Debtor to disclose information that would cause material competitive harm to the Debtor or would violate attorney-client privilege.

8.2 Actions Pending the Closing. Except (i) as required by applicable Law or by order of the Bankruptcy Court, (ii) as otherwise expressly contemplated by this Agreement, or (iii) with the prior written consent of Purchaser, during the period from the Effective Date to and through the Closing Date, the Debtor will:

(a) comply with the terms of the amended and restated DIP term sheet dated February 23, 2026 between the Debtor and the Purchaser (as the same may be modified, amended or replaced from time to time, the "DIP Term Sheet");

(b) comply with the Bidding Procedures Order;

(c) use commercially reasonable efforts to maintain the Purchased Assets in their current condition, ordinary wear and tear excepted;

(d) continue to maintain and operate its Business, its assets, operations and employees and those of its subsidiaries;

(e) take reasonable actions to defend and protect the Purchased Assets from infringement or deterioration; and

(f) comply with applicable Laws other than with respect to the failure of such compliance as would not reasonably be expected to have, individually or in the aggregate, a Debtor Material Adverse Effect.

8.3 Consents; Approvals.

(a) The Debtor will use its commercially reasonable efforts to obtain at the earliest practicable date any consents and approvals required to give effect to the transaction contemplated by this Agreement, including the Necessary Consents. Neither the Debtor nor Purchaser will be obligated to pay any consideration therefor to any third party from whom consent or approval is requested or to initiate any litigation or proceedings to obtain any such consent or approval. Each Party will use commercially reasonable efforts to furnish to the other Party all information required for any application or other filing to be made pursuant to any applicable Law for purposes of obtaining any such consents or approvals in connection with the Transaction. Each Party will promptly inform the other Party of any oral communication with, and provide copies of written communications with, any Governmental Body regarding any such applications or filings. No Party will independently participate in any formal meeting with any Governmental Body in respect of any such filings, investigation, or other inquiry without giving the other Party prior written notice of the meeting and, to the extent permitted by such Governmental Body, the opportunity to attend, participate, or both.

8.4 Further Assurances. Subject to the other provisions of this Agreement, Purchaser and the Debtor will each use commercially reasonable efforts to (a) take all actions necessary or appropriate to consummate the Transaction, (b) provide the other Party with reasonable cooperation and take such actions as the other Party may reasonably request in connection with the consummation of the Transaction, (c) following the Closing, execute and deliver such additional documents, instruments, assignments, conveyances and assurances, and take such further actions as may be reasonably required to carry out the provisions of this Agreement and give effect to the Transaction, and (d) cause the fulfillment at the earliest practicable date of all of the conditions to its obligations to consummate the Transaction.

8.5 Employees and Employee Benefits.

(a) Transferred Employees. Pursuant to procedures to be agreed to in good faith by the Parties, including as to the sharing of historical employment and compensation information, prior to the Closing, Purchaser will offer employment to each of the Debtor's employees primarily engaged in the Business who remain employed immediately prior to the Closing. Such individuals who accept such offer by the Closing Date are hereinafter referred to as the "Transferred Employees." All such offers of employment shall be in writing and shall be on terms, including, without limitation, with respect to compensation and benefits, that are no less favorable in the aggregate to those terms as each such employee is entitled from the Debtor as of immediately prior to the Closing. For purposes of determining eligibility and vesting and for purposes of determining benefits and accruals under any employee benefit plans, programs, agreements or arrangements sponsored by Purchaser or its affiliates providing benefits after the Closing (the "Plans"), the Purchaser shall use commercially reasonable efforts to provide that each Transferred Employee shall receive full credit for his or her service with the Debtor as of the Closing. In addition, Purchaser shall use commercially reasonable efforts (i) to cause each Transferred Employee to be immediately eligible to participate, without any waiting period, in any and all Plans and (ii) to the extent permitted by the then-existing terms thereof, to cause any "group health plans" (within the meaning of Section 5000(b)(1) of the Code) to (A) waive any pre-existing conditions exclusions or waiting periods for each Transferred Employee (to the extent that such exclusions or waiting periods did not apply to such Transferred Employees and his or her eligible dependents under a comparable plan, program, agreement or arrangement of the Debtor) and (B)

for the plan year in which participation in any Plan first occurs, if immediately prior thereto such Transferred Employee (or his or her eligible dependents) was participating in a comparable plan, program, agreement or arrangement of the Debtor, credit such Transferred Employee (and his or her eligible dependents) for any deductibles and out-of-pocket expenses paid, if any, during the Debtor's plan year in effect at the time participation in the Plan commences but only for the remainder of the applicable Plan year.

(b) Employment Tax Reporting. With respect to Transferred Employees, Purchaser and the Debtor will use the standard procedure set forth in Revenue Procedure 2004-53, 2004-34 I.R.B. 320, for purposes of employment tax reporting.

(c) No Obligations. Nothing contained in this Agreement will be construed to require, or prevent the termination of, employment of any individual, require minimum benefit or compensation levels or prevent any change in the employee benefits provided to any individual Transferred Employee.

## IX. CONDITIONS TO CLOSING

9.1 Conditions Precedent to Obligations of Purchaser. The obligation of Purchaser to consummate the Transaction is subject to the fulfillment, at or prior to the Closing, of each of the following conditions (any or all of which may be waived by Purchaser in whole or in part to the extent permitted by applicable Law):

(a) (i) the representations and warranties of the Debtor contained in this Agreement that are not qualified by materiality or Debtor Material Adverse Effect or similar qualification shall be true and correct in all material respects on and as of the date of this Agreement and on and as of the Closing, except to the extent expressly made as of an earlier date, in which case such representations and warranties shall be true and correct in all material respects as of such earlier date, and (ii) the representations and warranties of the Debtor contained in this Agreement that are qualified by materiality or Debtor Material Adverse Effect or similar qualification shall be true and correct in all respects on and as of the date of this Agreement and on and as of the Closing, except to the extent expressly made as of an earlier date, in which case such representations and warranties shall be true and correct in all respects as of such earlier date, and the Purchaser shall have received a certificate signed by an authorized officer of the Debtor on behalf of the Debtor, dated the Closing Date, to the foregoing effect;

(b) The Debtor shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by him prior to or on the Closing Date, and the Purchaser shall have received a certificate signed by an authorized officer of the Debtor on behalf of the Debtor, dated the Closing Date, to the foregoing effect; and

(c) The Debtor shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in Section 4.2.

9.2 Conditions Precedent to Obligations of the Debtor. The obligations of the Debtor to consummate the Transaction are subject to the fulfillment, at or prior to the Closing, of each of

the following conditions (any or all of which may be waived by the Debtor in whole or in part to the extent permitted by applicable Law):

(a) (i) the representations and warranties of Purchaser contained in this Agreement that are not qualified by materiality or Purchaser Material Adverse Effect or similar qualification shall be true and correct in all material respects on and as of the Closing, except to the extent expressly made as of an earlier date, in which case such representations and warranties shall be true and correct in all material respects as of such earlier date, and (ii) the representations and warranties of Purchaser contained in this Agreement that are qualified by materiality or Purchaser Material Adverse Effect or similar qualification shall be true and correct in all respects on and as of the Closing, except to the extent expressly made as of an earlier date, in which case such representations and warranties shall be true and correct in all respects as of such earlier date, and the Debtor shall have received a certificate signed by an authorized officer of Purchaser on behalf of Purchaser, dated the Closing Date, to the foregoing effect;

(b) Purchaser shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by Purchaser prior to or on the Closing Date, and the Debtor shall have received a certificate signed by an authorized officer of Purchaser on behalf of Purchaser, dated the Closing Date, to the foregoing effect; and

(c) Purchaser shall have delivered to the Debtor all of the items set forth in Section 4.3.

9.3 Conditions Precedent to Obligations of Purchaser and the Debtor. The obligations of Purchaser and the Debtor to consummate the Transaction are subject to the fulfillment, at or prior to the Closing, of each of the following conditions (any or all of which may be waived by Purchaser and the Debtor in whole or in part to the extent permitted by applicable Law):

(a) there shall not be in effect any Order by a Governmental Body restraining, enjoining or otherwise prohibiting the consummation of the Transaction; and

(b) the Bankruptcy Court shall have entered the Sale Order and the Sale Order shall be a final order in full force and effect and not subject to stay or appeal.

9.4 Frustration of Closing Conditions. No Party may rely on the failure of any condition set forth in Sections 9.1, 9.2 or 9.3, as the case may be, if such failure was caused by such Party's failure to comply with any provision of this Agreement.

## X. TAXES

10.1 Transfer Taxes. All documentary, stamp, transfer, motor vehicle registration, sales, use, excise and other similar non-income Taxes and all filing and recording fees (and any penalties and interest associated with such Taxes and fees) arising from or relating to the consummation of the Transaction (collectively, "Transfer Taxes") will be borne by Debtor, regardless of the Party on whom liability is imposed under the provisions of the Laws relating to such Transfer Taxes. The Parties will cooperate with each other in good faith in the provision of any information or

preparation of any documentation that may be necessary or useful for obtaining any available mitigation, reduction or exemption from any such Transfer Taxes.

10.2 Purchase Price Allocation.

(a) As promptly as practicable after the Closing Date, but no later than 90 days thereafter, Purchaser will prepare and deliver to the Debtor, an allocation schedule setting forth the amounts to be allocated among the Purchased Assets of the Debtor, pursuant to (and to the extent necessary to comply with) Section 1060 of the Code and the applicable regulations promulgated thereunder (or, if applicable, any similar provision under state, local or foreign Law or regulation) (the "Proposed Allocation Statement"). The Debtor will have twenty (20) Business Days following delivery of the Proposed Allocation Statement during which to notify Purchaser in writing (an "Allocation Notice of Objection") of any objections to the Proposed Allocation Statement, setting forth in reasonable detail the basis of his objections. If the Debtor fails to deliver an Allocation Notice of Objection in accordance with this Section 10.2(a), the Proposed Allocation Statement will be conclusive and binding on all Parties and will become the "Final Allocation Statement." If the Debtor submits an Allocation Notice of Objection, then for twenty (20) Business Days after the date Purchaser receives the Allocation Notice of Objection, Purchaser and the Debtor will use its commercially reasonable efforts to agree on the allocations. Failing such agreement within twenty (20) Business Days of such notice, the unresolved allocations will be submitted to an independent, internationally recognized accounting firm mutually agreeable to Purchaser and the Debtor, which firm will be instructed to determine its best estimate of the allocation schedule based on its determination of the unresolved allocations and provide a written description of the basis for its determination within forty-five (45) Business Days after submission, such written determination to be final, binding and conclusive. The fees and expenses of such accounting firm will be borne by the Debtor.

(b) The Debtor, and Purchaser and Purchaser's affiliates will report, act, and file Tax Returns (including, but not limited to IRS Form 8594) in all respects and for all purposes consistent with such allocation as determined pursuant to this Section 10.2. Except as set forth below, neither the Debtor nor Purchaser will take any position (whether in audits, tax returns or otherwise) that is inconsistent with such allocation unless required to do so by applicable Law. Notwithstanding the foregoing, no such allocation shall bind the Debtor or any party claiming an interest in the proceeds of the Transaction for purposes of determining the proper distribution of such proceeds in the Bankruptcy Case.

10.3 Certain Periodic Non-Income Taxes.

(a) With respect to any real or personal property or other periodic Taxes not based on income or receipts ("Periodic Non-Income Taxes") that are assessed on, or in respect of, the Purchased Assets and attributable to any period that begins after the Closing Date, if the Debtor pays such Periodic Non-Income Taxes, as promptly as practicable after delivery to Purchaser of proof of such payment, Purchaser will pay to the Debtor the amount of such Periodic Non-Income Taxes paid by the Debtor. With respect to any Periodic Non-Income Taxes that are assessed on, or in respect of, the Purchased Assets and attributable to any period that ends on or prior to the Closing Date, if Purchaser pays such Periodic Non-Income Taxes, as promptly as practicable after delivery to the Debtor of proof of such payment, the Debtor will pay to Purchaser the amount of

such Periodic Non-Income Taxes paid by Purchaser, but only to the extent such amount was not taken into account to determine any amount otherwise payable to the Debtor under any other provision of this Agreement.

(b) With respect to any Periodic Non-Income Taxes that are assessed on, or in respect of, the Purchased Assets and attributable to any period which includes but does not end on the Closing Date (a "Straddle Period"): (i) if the Debtor pays such Periodic Non-Income Taxes, as promptly as practicable after delivery to Purchaser of proof of such payment, Purchaser will pay to the Debtor the amount of such Periodic Non-Income Taxes paid by the Debtor that are attributable to the portion of such Straddle Period beginning after the Closing Date (the "Post-Closing Straddle Period"); and (ii) if Purchaser pays such Periodic Non-Income Taxes, as promptly as practicable after delivery to the Debtor of proof of such payment, the Debtor will pay to Purchaser the amount of such Periodic Non-Income Taxes paid by Purchaser that are attributable to the portion of such Straddle Period up to and including the Closing Date (the "Pre-Closing Straddle Period"), but only to the extent such amount was not taken into account to determine any amount otherwise payable to the Debtor under any other provision of this Agreement. For purposes of this Section 10.3(b), the amount of Periodic Non-Income Taxes attributable to a Pre-Closing Straddle Period will be based upon the ratio of the number of days in the Pre-Closing Straddle Period to the total number of days in the Straddle Period, and the amount of Periodic Non-Income Taxes attributable to a Post-Closing Straddle Period will be based upon the ratio of the number of days in the Post-Closing Straddle Period to the total number of days in the Straddle Period.

(c) The party that has the primary obligation to do so under applicable Law will timely pay to the applicable Governmental Body any Periodic Non-Income taxes covered by this Section 10.3.

10.4 Cooperation and Audits. Purchaser, its affiliates and the Debtor will cooperate fully with each other regarding Tax matters (including the execution of appropriate powers of attorney) and will make available to the other as reasonably requested all information, records and documents relating to Taxes governed by this Agreement until the expiration of the applicable statute of limitations or extension thereof or the conclusion of all audits, appeals or litigation with respect to such Taxes.

## XI. MISCELLANEOUS

11.1 No Survival of Representations and Warranties. The Parties agree that the representations and warranties contained in this Agreement will not survive the Closing hereunder, and neither Party will have any liability to the other after the Closing for any breach thereof. The Parties agree that the covenants contained in this Agreement to be performed at or after the Closing will survive the Closing hereunder until the expiration of the applicable statute of limitations or for such shorter period explicitly specified therein, and each Party will be liable to the other after the Closing for any breach thereof.

11.2 Expenses. Except as otherwise expressly provided in this Agreement, whether or not the Transaction is consummated, each of the Debtor and Purchaser will bear its own expenses

incurred in connection with the negotiation and execution of this Agreement and the Transaction Documents and the consummation of the Transaction and all proceedings incident thereto.

11.3 Submission to Jurisdiction; Consent to Service of Process. (a) Without limiting any Party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court will retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Transaction, and (ii) any and all Legal Proceedings related to the foregoing will be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court for such purposes; provided that if the Bankruptcy Case has been closed pursuant to Section 350 of the Bankruptcy Code, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the Delaware Court of Chancery and any state appellate court therefrom within the State of Delaware (or in the event (but only in the event) that such court does not have subject matter jurisdiction over such Legal Proceeding in the United States District Court for the District of Delaware) and any appellate court from any of them, for the resolution thereof. The Parties irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the Parties agrees that a judgment in any such Legal Proceeding may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(b) Each of the Parties consents to process being served by any Party to this Agreement in any Legal Proceeding by delivery of a copy thereof in accordance with the provisions of Section 11.7, except that such service will not be effective until the actual receipt thereof by the Party being served.

11.4 Waiver of Right to Trial by Jury. TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW THAT CANNOT BE WAIVED, EACH PARTY WAIVES, AND COVENANTS THAT IT WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE), ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE, CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING IN WHOLE OR IN PART UNDER, RELATED TO, BASED ON OR IN CONNECTION WITH THIS AGREEMENT, ANY TRANSACTION DOCUMENT OR THE SUBJECT MATTER HEREOF OR THEREOF, WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER SOUNDING IN TORT OR CONTRACT OR OTHERWISE. ANY PARTY MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION 11.4 WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF EACH SUCH PARTY TO THE WAIVER OF ITS RIGHT TO TRIAL BY JURY.

11.5 Entire Agreement; Amendments and Waivers. This Agreement (including any Exhibits and Schedules hereto) and the other documents delivered pursuant hereto represent the entire understanding and agreement among the Parties with respect to the subject matter hereof and supersede all prior discussions and agreements among the Parties with respect to the subject matter hereof; provided that nothing in this Agreement shall affect any rights or obligations of the parties under the DIP Term Sheet. This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to

this Agreement signed by the Party against whom enforcement of any such amendment, supplement, modification or waiver is sought. No action taken pursuant to this Agreement, including any investigation by or on behalf of any Party, will be deemed to constitute a waiver by the Party taking such action of compliance with any representation, warranty, covenant or agreement contained herein. The waiver by any Party of a breach of any provision of this Agreement will not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder will operate as a waiver thereof, nor will any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy. All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

11.6 Governing Law. This Agreement and any claims arising from or related to this Agreement sounding in tort will be governed by and construed in accordance with the laws of the State of Delaware applicable to contracts made and performed in such State, without regards to its conflict of laws principles.

11.7 Notices. All notices and other communications under this Agreement will be in writing and will be deemed given (a) when delivered by hand (with written confirmation of receipt), (b) when sent by email of a PDF document (with confirmation of transmission), or (c) one Business Day following the day sent by nationally recognized overnight courier (with written confirmation of receipt), in each case at the following addresses (or to such other address as a Party may have specified by notice given to the other Parties pursuant to this provision):

If to the Debtor, to:

George Perry. CEO
Black Buffalo 3D Corporation
1071 Hudson Street
Union, NJ 07083
Email: george.perry@blackbuffalo.io

with a copy (which will not constitute notice) to:

Ballard Spahr LLP
222 Delaware Avenue
10th Floor
Wilmington, DE 19801
Attention: Laurel D. Roglen, Esq.
Email: roglenl@ballardspahr.com

If to Purchaser, to:

Black Buffalo JVCo LLC

Attention: Stephen Arbib & Sean Masterson
Email: sarbib@menain.com & sean@sidewinderenterprises.net

with a copy (which will not constitute notice) to:

Norton Rose Fulbright
Womble Bond Dikcinson (US) LLP

Attention: Julie Harrison & Eric Reither
Matthew Ward
Email: Julie.harrison@nortonrosefulbright.com, eric.reither@nortonrosefulbright.com, matthew.ward@wbd-us.com

11.8 Severability. If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any law or public policy, all other terms or provisions of this Agreement will nevertheless remain in full force and effect so long as the economic or legal substance of the Transaction is not affected in any manner materially adverse to any Party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties will negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the Transaction are consummated as originally contemplated to the greatest extent possible.

11.9 Assignment. This Agreement will be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns. Nothing in this Agreement will create or be deemed to create any third party beneficiary rights in any Person or entity not a Party. No assignment of this Agreement or of any rights or obligations hereunder may be made by either the Debtor or Purchaser (by operation of law or otherwise) without the prior written consent of the other Party and any attempted assignment without the required consents will be void, except that Purchaser may assign some or all of its rights or delegate some or all of its obligations hereunder to one or more affiliates. No assignment of any obligations hereunder will relieve the Parties of any such obligations. Upon any such permitted assignment, the references in this Agreement to the Debtor or Purchaser will also apply to any such assignee unless the context otherwise requires.

11.10 Non-Recourse. Neither the Debtor, nor any past, present or future director, officer, employee, incorporator, member, partner, equityholder or affiliate of the Debtor will have any liability for any obligations or liabilities of the Debtor under this Agreement or any agreement entered into in connection herewith of or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby and thereby.

11.11 Counterparts. This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement. Signatures delivered by electronic means will have the same force and effect as manual signatures delivered in person.

11.12 Time Is of the Essence. With respect to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

[*signature page follows*]

IN WITNESS WHEREOF, each Party has caused its duly authorized officer to execute this Agreement as of the Effective Date.

**PURCHASER:**
**BLACK BUFFALO JVCO LLC**

By:__________________________________
Name:
Title:

**DEBTOR:**
**BLACK BUFFALO 3D CORPORATION**

By:__________________________________
Name: George Perry,
Title: Chief Executive Officer

**Schedule A**

Bidding Procedures Order

**Schedule B**

Sale Order

**Schedule 2.1(b)(i) – Tangible Personal Property**

| Inventory Item | Manufacturer | Model | Serial Number | Category | Quantity |
|---|---|---|---|---|---|
| 3D Construction Printer | BB3D | NC-1G | 22-02-100-E-008 | Saleable Inventory | 1 |
| 3D Construction Printer | BB3D | NC-1G | 22-02-100-E-010 | Saleable Inventory | 1 |
| Prototype Robotic Arm Printer | BB3D | NC-R1 | 010.9509.2777 | R&D Equipment | 1 |
| Mortar delivery system | Mai | Mutli-mix | 15847 | R&D Equipment | 1 |
| Batch System | BB3D | B-0.56 | N/A | R&D Equipment | 1 |
| Prototype Pump | BB3D | Castypump | N/A | R&D Equipment | 1 |
| Concrete Testing Equipment | Various | N/A | N/A | R&D Equipment | 1 |
| Welding Machine | Lincoln Electric | LF-72 | U1100801258 | R&D Equipment | 2 |
| Welding Machine | Lincoln Electric | LF-72 | U1050414917 | R&D Equipment | 2 |
| Bulk Bag Unloader | Vibrascrew | II-VHD | 2025132 | R&D Equipment | 1 |
| Compressor | Gardner Denver | CASRSA38,HRA25-12,208/3,S | D028348 | R&D Equipment | 1 |
| End Mill | Bridgeport | N/A | J27202 | R&D Equipment | 1 |
| Mixed Mortar for R&D | Empire Blended | N/A | N/A | Perishable goods | 2 |
| Forklift | Yale | GLC050VXNVSE083 | A910V21949L | Plant Equipment | 1 |
| Forklift | Yale | GLP050VXNDAE086 | D875V02447N | Plant Equipment | 1 |
| Scissor Lift | Genie | GS-4069DC | GS6913-1869 | Plant Equipment | 1 |
| Gantry lift | Stongway | 57022 | NFJL57022201228 | Plant Equipment | 2 |
| Pallet Jack | Eoslift | N/A | N/A | Plant Equipment | 1 |
| Small Tools | Various | N/A | N/A | Plant Equipment | 1 |
| Forklift Dumpster | N/A | D-100-LD | S2529583 | Plant Equipment | 1 |
| Desktop Slicer Software | Simplify 3D | 5.1.2 | N/A | Software License | 1 |
| PDF Editing Software | Bluebeam | Revu 20.3.30 | 1801827 | Software License | 1 |
| Personal Computers | Various | N/A | N/A | Office Equipment | 5 |
| Desks | Various | N/A | N/A | Office Equipment | 8 |
| Misc Furniture (tables, couches, chai | Various | N/A | N/A | Office Equipment | 1 |
| Televisions | Various | N/A | N/A | Office Equipment | 2 |
| Printer spare parts | Various | N/A | N/A | Inventory | 1 |
| Transformers (480V/230V) | SI | N/A | N/A | Inventory | 8 |

**2.1(b)(iii) – Purchased Intellectual Property**

| Type | Description | Status |
|---|---|---|
| Patent | US20220349192-A1 | Awarded |
| Patent | US-20220339817-A1 | Awarded |
| Patent | US-20220341196-A1 | Awarded |
| Patent | #19/302,150 | Pending |
| Domain | bb3d.io | Active |
| Other IP | Proprietary Controls System Software - Printer | N/A |
| Other IP | Proprietary Controls System Software - Material Delivery Syste | N/A |
| Other IP | Batch 1.0 - Material Delivery System Design Documentation | N/A |
| Other IP | NC-1G Printer Design Documentation | N/A |
| Other IP | NC-G2 Printer Design Documentation | N/A |
| Other IP | New Mortar Pump Design Documentation | N/A |
| Other IP | Mortar Mix Desings | N/A |
| Trademark | Black Buffalo 3D - serial 90002064 | Live/Registered |
| Trademark | Black Buffalo - serial 88740441 | Live/Registered |

**2.1(b)(vi) – Purchased Contracts**

| Item | Counterparty | Cure Amount |
|---|---|---|
| Union, N.J. Office/Plant Lease (Lease Agreement dated December 27, 2023, in respect of 1071 Hudson Street, Union County State of New Jersey) | Lester Robbins, Trustee, a/k/a Highway Joint Venture<br>1150 Union, NJ 07083 | $0 |
| Black Buffalo Land Acquisition Lease (Lease Agreement dated October 26, 2023 , in respect of 128 Airstrip Rd., East Stroudsburg, Monroe County, Pennsylvania) | Black Buffalo Land Acquisition, LLC<br>182 Airstrip Rd.<br>East Stroudsburg, PA 18301 | $10,560 |
| Software License - SOLIDWORKS | Dassault Systemes<br>175 Wyman St<br>Waltham, MA 02451 | $0 |
| Software License - AUTODESK | Autodesk<br>One Market, Ste. 400<br>San Francisco, CA 94105 | $0 |
| Consulting Agreement | Let's Play Production Inc.<br>72 Cromford Place<br>Franklin, TN 37069 | $0 |
| Manufacturing and Distribution License Agreement | MAPEI Corporation<br>1144 East Newport Center Dr.<br>Deerfield Beach, FL 33442 | $0 |
| Consulting Agreement | Presidio Advisors DWC-LLC<br>Building C, 3rd Floor<br>Logistics City, Dubai South<br>Dubai UAE | $0 |
| Guideline 401k (Subscription - Not Contract) | Guideline<br>525 20th Street<br>San Francisco, CA 94107 | $0 |
| United Healthcare | United Healthcare / Optum<br>9800 Health Care Lane<br>Minnetonka, MN 55343 | $0 |
| Gusto (Subscription - Not Contract) | Gusto, Inc.<br>525 20th Street<br>San Francisco, CA 94107 | $0 |
| Musser Contract | Musser Automation<br>PO Box 11<br>Rock Spring, GA 30739 | $0 |

**2.1(b)(vi) – Purchased Contracts**

| Item | Counterparty | Cure Amount |
|---|---|---|
| General Liability/Umbrella Insurance | AFCO Corporation<br>Two Conway Park<br>150 N. Field Drive, Suite 190<br>Lake Forest, IL 60045 | $0 |
| D&O Insurance | Axis Insurance<br>c/o Bradley Parker<br>320 S. Service Road<br>Melville, NY 11747 | $0 |
| Excess D&O Insurance | StarStone Specialty<br>c/o Bradley Parker<br>320 S. Service Road<br>Melville, NY 11747 | $0 |
| Workers Compensation | Traveler's Insurance<br>PO Box 5600<br>Hartford, CT 06102 | $0 |
| Property Insurance | First Insurance Funding<br>450 Skokie Blvd, Ste 1000<br>Northbrook, IL 60062-7917 | $0 |
| Part-Time Chief Financial Officer | Carlo Rigillo<br>108 Isernia cres<br>Woodbridge ON<br>L4H 0W9 | $15,000.00 |

**2.1(b)(vii) – Accounts Receivable**

Alquist 3D Judgment - $411,000.00

**2.3(g) – Assumed Liabilities**

| Payable to | Description | Amount |
|---|---|---|
| Joseph Farco | Attorney for NC-G2 Patent Application | $19,787.50 |
| Nauth LPC | Legal Fees | $1,193.59 |